SAMUEL SCHELLER ET AL. *v.* MARGARET A. SCHINDEL.

*Testamentary Incapacity — Sufficiency of Evidence — Temporary Delusions—Opinion Evidence—Hypothetical Questions.*

If, on a consideration of the whole case, the court is satisfied that there is no testimony made to bear such relation to testator's condition at the time of making his will that a reasonable mind could infer that at that time testator was incapable of executing a valid deed or contract, the question of testamentary capacity is one of law for the court.                    p. 551

Evidence to show testator's mental incapacity *held* insufficient to go to the jury, there being no testimony as to permanent insanity, but merely testimony as to temporary aberrations, perhaps induced by liquor and drugs, at times other than that of the execution of the will, except that a retired physician, the husband of caveatrix, testator's sister, without any training in mental diseases and without having given testator any special examination, stated that from testator's manner and conversation he concluded that testator had paresis.            p. 562

In the absence of evidence of permanent insanity, to allow a witness, who was unable to testify to any exhibition of mental deficiency by testator when last seen by him, to state that in his opinion testator was then incapable of understanding the nature of the business in which he was engaged, was prejudicial error, especially in view of witness' testimony that testator was then under the influence of morphia.            p. 563

The opinion of a witness as to testator's mental incapacity, based merely on testator's "manner and conduct, his gait, his manner of walking, his big ideas," was improperly admitted.

pp. 563, 564

Testimony by a physician, a friend of testator, also a physician, as to a statement by the latter that he knew by experience that it is almost necessary to have morphia when one is accustomed to using it, was improperly admitted to show that testator was then a confirmed addict, the time of the statement not being fixed, and it not showing that testator referred to his own habit.

p. 566

A question asked a physician, acquainted with testator, as to whether testator was suffering from a disease and the nature of the disease, *held* objectionable, as not relating to any specific time, as assuming the truth of evidence which consisted in part of guesses by witnesses, and as not distinguishing between the witness' opinion based on the assumption of the truth of testimony and that based on mere personal acquaintance.            p. 567

A hypothetical question which fails to embrace every material element of the hypothesis founded upon the evidence, or contains any element not founded upon the evidence, should not be allowed to be answered.            p. 567

Questions asked a physician as to the effect of a psychosis, such as he imputed to testator, on the judgment, on the ability to understand the nature of the business in which the sufferer is engaged, and on his ability to recollect the relative claims of possible objects of his bounty, *held* to have been improperly allowed, they being abstract questions not related to the time of the execution of the will, and the uncontradicted testimony being that at that time testator had none of the symptoms described by the witness.                p. 568

A physician, acquainted with testator, was improperly allowed to express an opinion, based on the testimony, as to testator's mental capacity at the time of the execution of the will, in view of uncertainty as to whether he had heard all the testimony, and of the fact that the testimony showed merely delusions and a weakened physical and mental condition, the witness himself referring to the testator's aberrations as delusions.      p. 575

The opinion of a witness that testator was incapable of making a valid deed or contract was valueless, if his examination showed that he supposed a man suffering from insane delusions to be incapable in this respect.              pp. 569, 575

A question asked the caveatrix, testator's sister, with the purpose of showing that she had married a man of considerable means, and that this was known to testator, was improperly excluded.                          p. 578

Want of testamentary capacity, when urged as a ground for the invalidity of a testamentary act in a given case, must relate to the time of the act.          .          p. 581

Unless want of capacity, permanent in character, be established by proof as existing at a time prior to the testamentary act called in question, the presumption of capacity attends the act, and must be overcome by evidence that affords a rational basis for an inference of the want of it at the very time of the act.                          p. 582

*Decided July 15th 1927.*

Appeal from the Circuit Court for Allegany County (DOUB, J.).

Petition and caveat by Margaret A. Schindel as regards an alleged will of Christian R. Scheller, deceased, opposed by Samuel Scheller and others. From rulings in favor of the caveatrix, the caveatees appeal. Reversed.

The cause was argued before Bond, C. J., Pattison, Urner, Adkins, Offutt, Digges, Parke, and Sloan, JJ.

*John E. Wagaman* and *Saul Praeger,* with whom was *Harper Ballentine* on the brief, for the appellants.

*F. Brooke Whiting* and *A. S. Mason,* with whom was *Alexander R. Hagner* on the brief, for the appellee.

Adkins, J., delivered the opinion of the Court.

This is one of the numerous will contests which abound in our reports. The will in controversy is that of Dr. Christian R. Scheller, who, during a long professional career, had been continuously a general practitioner of medicine in the City of Hagerstown up to within about ten days of his death, on March 6th, 1926. The testator had been in poor health for some months, but the beginning of his final illness began a few days before the day of the sale of his household and personal effects, which he had at his home eight days before his death. At the sale, which was on Friday, and for several days preceding it, he complained of feeling ill with severe pains in his chest, and on the evening of that day he drove to the home of one of his sisters, Mrs. Annie Oller, where he had removed such of his furniture and effects as he desired to keep, and remained there until he died.

A sister, Mrs. Margaret Schindel, who was not named as a beneficiary of the will, is the caveator, and the single issue submitted to the jury was that of mental capacity. Originally all the usual issues were included, but the court by properly granted prayers eliminated the others. The jury found for the caveator, and this appeal is from adverse rulings at the trial.

There are sixty-eight bills of exceptions in the record, one of which relates to the ruling on the prayers and all the

others to rulings on testimony. Of these the following were abandoned in appellant's brief: Nos. 16 to 19, inclusive; Nos. 22, 29, 32, 34, 48 to 61, inclusive, and Nos. 63 to 65, inclusive.

As the most important exception is to the refusal of defendant's third, a demurrer, prayer, in the 68th exception, we will consider that first; and in doing so, it will be necessary to review all the testimony, because in cases of this kind it is important to get the whole picture, in order to properly appraise the bearing of the several parts. Incidents which might be of great importance, in determining the mental capacity of one man in one set of circumstances, would not even tend to prove incapacity in the case of a different man in different circumstances. Of course, it must not be forgotten that the jury is the judge of the facts, if there are any facts proved in a given case from which a reasonable mind could find for the plaintiff. But if, in a will contest, on consideration of the whole case, the court is satisfied that there is no testimony *made to bear such relation to the condition of the testator at the time of making his will* that a reasonable mind could infer from it that at *that time* the testator was incapable of executing a valid deed or contract, then it becomes a question of law to be decided by the court. *Berry Will Case,* 96 Md. 45, 93 Md. 560; *Gesell v. Baugher,* 100 Md. 688; *Baugher v. Gesell,* 103 Md. 458; *Kelly v. Kelly,* 103 Md. 556; *Birchett v. Smith,* 150 Md. 377.

Defendants produced six apparently disinterested witnesses, viz: Dr. W. Howard Yeager, Dr. Charles L. Mowrer, Mrs. Bowman, Russell A. Eldridge and Mrs. Russell A. Eldridge. Besides these, Mrs. Anne Oller, Miss Bessie Oller, Samuel Scheller, Fred. Scheller and Miss Susan Rowland, beneficiaries under the contested will, also testified.

Dr. Mowrer's testimony was unimportant. He was called in about midnight of March 5th because the attending physician had been called out of town. He found the patient in bed, apparently resting very well. Witness prescribed for him a tablet of caffeine and a small amount of acetanilid,

"does not think the medicine was given him while" witness was there, but is not sure.

Dr. Yeager testified that he had been a practicing physision since 1912, in Hagerstown since January, 1920; that he did a little general work, but since the war has specialized in diseases of the chest and in internal medicine; that he was called in to see Dr. Scheller on Tuesday, March 2nd, 1926, about five or six o'clock in the evening. Dr. Scheller told him that he was suffering with a severe pain in the left chest and that he had been feeling badly for about a week, that he had difficulty in breathing. On the first examination witness found nothing definite and diagnosed the trouble as intercostal neuralgia. That visit lasted about fifteen minutes, during which time the patient answered all questions intelligently. He returned at about ten o'clock the same night, found the patient suffering intense pain, and at that time made a thorough examination, and found the trouble was angina pectoris, and remained until about midnight, until the pain abated. During the two hours he talked with the patient more or less all the time and he answered all questions intelligently, and was perfectly coherent about everything. Witness called again the next morning between seven and eight o'clock and found the patient up and dressed. He was in the bath room. He said he was feeling very much better, and remarked "You must have considered me pretty ill last night." Witness told him he did, that he was suffering with an attack of angina pectoris. He said nothing immediately, but in a little while asked witness if he thought he would be able to attend a case he had in court against the Lime and Cement Company for damaging his orchard. Witness advised him that this was impossible, that he must keep absolutely quiet. At that time he was perfectly rational and normal. The next visit was on Thursday, late in the afternoon. He was then sitting in a chair by the window; said he was feeling "a whole lot" better. Witness saw nothing unusual about him; he answered all questions intelligently and discussed the weather conditions; "I remember that." That was the last visit. Witness had

known testator since 1919 and from then until December, 1923, rented an office in his building and saw him frequently; after moving from the building he saw him occasionally, but not as frequently as before; was in consultation with him twice after his return from treatment at Laurel in 1924.

Q. Now, Doctor, from your acquaintance with him and your occasional meetings with him in the times you have described, and taking into consideration with your several or more visits that you made to him on March 2nd, 3rd and 4th, immediately prior to his death, and from your own knowledge of Dr. Scheller, would you say that—will you state whether or not on March 5th, the day after your last visit there, at eight o'clock at night of that day, that you would consider him capable of executing a valid deed or contract? A. If he were in the same state as he was on the third and fourth. He would not have been on the second of March. He was too ill at the time, suffering from extreme pain.

On cross-examination the witness said he told Dr. Watkins, when witness got notice from Dr. Scheller to leave his building, that he was glad to leave at that time for the simple reason—I didn't say he was insane—for the simple reason that he was under the influence of morphia. Q. And that you were afraid he might burn the building. Didn't you say that? A. Yes, sir, I said that—but not that he was insane. I knew at that time what his trouble was. Q. Did you make any examination, or such a complete examination as would enable you to determine whether he had any psychosis on the second, third and fourth of March? A. I did not, sir. It was not necessary. Q. Why do you say it was not necessary? A. He was suffering with a definite diseased condition at the time, but his answers to my questions were of an intelligent character. Q. Then you could not say whether or not he was suffering from any psychosis, could you? A. I would say that he was not suffering from it.

Asked how he could tell if he made no examination, witness said, "Well, he would certainly show some symptoms

such as your testimony shows as to rambling speech and so
on—some mental attitude there that was abnormal or un-
usual.   (Court): Doctor, the jury would like to know what
kind of treatment you gave him—whether you gave him
opium?   A. No, sir, I did not, knowing his past history.   I
did not resort to opium.   It was really indicated in his case,
but I didn't resort to it, knowing his past history.   Q. There
was no dope used at all?   A. Not during my attendance, no.
I resorted to other means to relieve pain and I waited to see
the effect of my treatment.   Witness did not give him any-
thing that would cloud his mind.   The first time witness
realized that testator was taking morphia was in December,
1923.

Mrs. Bowman, a practical nurse, who was accustomed to
nurse in confinement cases, had known testator about thirty-
five years.   She last saw him on February 22nd, 1926, on
Monday before his sale.   She was with him in a confinement
case.   "He went about his work as good as any doctor I
ever saw."   Saw nothing unusual in his conduct.

Mr. and Mrs. Eldridge knew testator intimately from 1921
until his death.   Apparently they were his closest and most
congenial friends.   The friendship between them seems to
have grown out of boyhood friendship of Mr. Eldridge and
testator's son, who died in 1920.   In 1921, after the son's
death, they were with testator for five days at Ocean City
at a fruit growers' meeting, and from that time on they were
with him frequently, several times a month, at their respec-
tive homes, on automobile rides, at the theatre, or at church.
They often took meals at each other's homes.   He was at
their home Christmas night, 1925, from nine o'clock until
midnight; and seemed unusually happy.   They played five
hundred, and he sang.   He had a fine voice.   The following
month he was at their home four or five times and took a meal
with them.   He cooked his own meals and looked after the
furnace.   They spent an evening at his house about six hours,
four weeks before his death, and spent the evening playing
five hundred.   Mr. Eldridge is in the dairy business and
sold milk to the testator during most of these years.   He was

always prompt in his monthly settlements. During the last two or three years of his life Mr. Eldridge saw him almost daily. They were frequently together on all-day automobile trips to Baltimore, Washington and elsewhere. When they went in testator's car, he always drove and was a very careful and capable driver. Mr. Eldridge saw him the last time two days before he died, while he was in bed. Talked with him about fifteen minutes. He said he was feeling better and thought he would be out in a week; said he wanted to make his trip to the coast, and that he wanted to make his will before he left town. In all these years neither Mr. nor Mrs. Eldridge ever noticed anything unusual about his conversation, his manner, his dress or his appearance. He told Mrs. Eldridge about his treatment at Laurel Sanitarium for the drug habit. He always talked intelligently and was a most congenial companion; he talked with Mrs. Eldridge about a month before his death about making a will; said he wanted Mrs. Oller and Bessie Oller to be cared for; that he had already provided during his life for his sister Margaret. He also told Mr. Eldridge that he was not going to provide for her, that she had overcharged him for everything she ever did for him, and that she got more out of the estate of his father and mother than the rest of the children got, and that she was largely responsible for putting him in the Laurel Sanitarium. He continued in active practice up to the time of his last illness.

John E. Wagaman, a member of the Washington County bar, practicing in Hagerstown, knew testator for about thirty years; was called in to draw the will and got there about four o'clock in the afternoon of March 5th, 1926; testator was in bed; he gave witness explicit directions for drawing the will; said he thought probably he ought to give something to charity; said he had considered giving to some church a few hundred dollars, but had abandoned that idea. He said he didn't want to give his sister Maggie anything, but he understood it would be necessary in order that the will should stand, that it would be necessary for him to provide for her in some amount and asked witness whether that was correct;

witness told him it was not necessary; that if he did not want to provide for her in the will he could leave her name out entirely. He spoke of Fred. Scheller; said he had had some doubt as to whether or not he should provide for him, because he was unaware of his financial position, but he had made a trip down to see him to ask him about his financial situation, and had concluded to give him $2,500; said he wanted to give Mrs. Oller's daughter, his niece Bessie, the automobile and the diamond ring; that he wanted to provide for all of the family except his sister Maggie. Witness asked him the names of his brothers and sisters; testator first gave him the name of Mrs. Annie E. Oller, said she spelled it O-l-l-e-r. He mentioned the name of another sister, Katherine A. Emmert, and said she spelled it with a C; that she lived in Pennsylvania and was the wife of David Emmert whom witness knew in his lifetime; said he would give $200 to Susan Rowland, who had been in his employ for a number of years; that Mrs. Oller, the sister with whom he was living, was to have the furniture in his room; named Samuel Scheller, his brother, the sole executor without bond, and gave him all his clothes and gold cuff buttons; and directed that Samuel should hold the property as long as he saw fit, and then, by a sale or a number of sales, according to his best judgment, he should sell it and also the orchard which he then owned; that he told witness he had sold the farm away from the orchard, leaving it cut off from the road; that he had arranged with the purchaser of the farm for a right of way from the orchard out to the road on which the farm fronted, but said that was not satisfactory, that Sam, before he sold the farm, should acquire a right of way out to the other road which was near the orchard; he said he had spoken to Mr. Itmire and he promised to let him have a right of way over his field, but he thought a right of way through Mr. Loos' field would be better. He said it would be for Sam with witness' assistance to look after that; that testator after making the specific bequests above mentioned directed that the residue of his estate be divided equally between

Annie E. Oller, sister; Catherine E. Emmert, sister; Bessie
E. Oller, daughter of Annie E. Oller and Samuel Oller.

Witness was there quite a while, probably an hour. "We
talked over other things beside the will." Witness further
testified that testator appeared to understand fully what he
was doing; had a clear recollection of his property and of
the persons to whom he intended to give it, and named them
all over to him; understood the manner in which he intended
to dispose of his property and the relative claims of the dif-
ferent persons who were or ought to have been the object
of his bounty; that witness returned at about eight o'clock
with the will prepared according to the above instructions
and found the testator in same condition as when he gave the
instructions; that he read over the will and discussed its
provisions; and testator executed it with witness and his
partner, Mr. Ballentine, as witnesses; that on neither occa-
sion did he observe anything unusual about Dr. Scheller's
conduct, speech or manner. At the time of the execution of
the will witness and Mr. Ballentine were there about half
an hour. Witness further testified that during the last five
or six years of testator's life he had seen him frequently;
that he was a client of his for the last year or more, and dur-
ing the last few months of his life he would see him several
times a week, as he had a law suit pending; that at the hour
he executed the will he was of sound and disposing mind
and capable of making a valid deed or contract. Harper
Ballentine corroborated previous witness as to the capacity
and understanding of testator at the time of executing the
will, and as to what occurred in his presence.

Mrs. Annie E. Oller testified that she never saw anything
the matter with testator's mentality except once, in 1923,
when he was in a stupor from taking an overdose of para-
goric. He was weak physically at times, but would get all
right again; that during his last illness he came down to
dinner Tuesday, but after that stayed in his room, part of
the time in bed and part of the time he would be up in a
chair and walking about the room and into the bath room;
that he took no medicine during this illness except that pre-

scribed by the doctor and some stomach medicine and cough drops she had. Did not complain of pain on Friday evening, March 5th, until about nine o'clock at night. In answer to the question, "You noticed nothing unusual?" witness said, "He was just as calm as he could be. He was more natural than I had seen him for awhile before that." On cross-examination, in answer to the question, "Did he then say he had given you anything else except the furniture?" she said, "Well, I would come in equally with the rest of them."

Bessie Oller also testified that he did not complain of pain that day until some time after supper, she thinks about ten o'clock, just before she went to bed; did not know of him taking any medicine except that which was prescribed. Did not notice anything about his conduct except that he was sick.

Susan Rowland testified that testator was unwell on the day of the sale, and had to lie down at the beginning of it and after it was over; that she didn't observe anything unusual about his conduct or speech on that day.

Samuel Scheller was at testator's sale; testator didn't take any part in it, except when they came to the books, he would tell the people what they were; after the sale he and testator drove home together to Mrs. Oller's, testator driving his Buick car; was with him most of the time during his last illness except Monday; Wednesday afternoon asked witness to go down town and pay off some bills for him and to deposit the checks from the sale, he having endorsed them; was with him when he died about five o'clock in the morning of March 6th; did not observe anything unusual about his conduct or speech during his illness; that after the will was signed testator said to witness that his sister Margaret was able to live before she was married, and after she was married she would surely be able to take care of herself, and he was going to give to the others because she didn't need it, and they would have more to go on.

On cross-examination witness was asked: Q. Was he the same then (during his illness) as he was when you were staying with him up at his house? A. Well, he was not just

the same as he was then.  Q. What was the difference?
A. He knowed what he was doing.  Q. Did he know what
he was doing when you were staying up at his house?  A.
Yes, sir; I think he knowed all the time.  Witness admitted
on cross-examination, when asked about his going to Dr.
Wertz in October, 1925, and if he didn't think then that
testator didn't know what he was doing, and wasn't capable
of taking care of his property, "Well, he wasn't very cap-
able of taking it then."

Fred P. Scheller testified that about three weeks before
testator's death he came down to witness' father-in-law, and
told witness he wanted to talk with him, and said he hadn't
given him anything in his last will, which he destroyed, as
he thought he didn't need it. and asked witness what he
thought about it; witness told him he thought he ought to
be remembered.  In that conversation he said he was going
to make another will and was going to take care of Bess,
and was going to make "your Uncle Sam" the executor of
the will; that he wasn't going to leave witness' Aunt Mar-
garet anything; that she was prepared to take care of her-
self before she was married, and now she was better pre-
pared.

Defendants offered in evidence a will of testator made in
1921, in which the plaintiff was not named as a beneficiary.
Plaintiff produced a number of witnesses to prove peculiar
conduct of the testator and hallucinations as to wealth, and
that he was addicted to the use of morphia and alcoholic
liquor.

Dr. E. N. Schindel, husband of the plaintiff, who had not
practiced medicine for eight years, testified that he had
known testator intimately for at least thirty years, and mar-
ried his sister in December, 1925; that during the period of
his acquaintance he saw testator frequently, sometime daily,
sometimes twice a day; that they lived only half a block
apart and they visited each other.  That prior to his death
testator was very weak physically; he would take hold of
witness' arm and use a cane when they would go out together;
that he was growing physically weaker all the time for the

last two years before his death, at the age of sixty-five years;
his gait was irregular and jerky, which was not at all natural
to him; that he noticed a decline both mentally and physically
for the last seven years; the beginning of it was a convulsion
which he had while sitting on a settee with witness on a
warm day; that he noticed a change in his conversation and
a gradual deterioration; that he was not the strong vigorous
man that he was before, mentally, that he gradually grew
worse, until towards the close of his life he was physically
disabled to a considerable extent; he could get around but
he was not at all strong physically, and mentally weak as
well; that from a period of eighteen months or more before
his death he had hallucinations—exalted ideas about his
wealth and what he was going to accomplish in the world;
spoke about building the largest hotel—that he had bought
the property on the corner of one of the principal streets
extending almost half a block and was going to erect the
largest and finest hotel in that section; that this was within
three or four months of his death; that these hallucinations
continued up until the last time witness saw him, which was
about eight days before his death; the last thing witness re-
membered was his talk about a trip to California; he said
he was going out there—going to buy out the practice of his
preceptor, who had been practicing there for a number of
years; that about a month or two before his death he spoke
of going into the chicken business; said he was going to have
fifty thousand chickens out in his apple orchard; later said
he was going into the hog business; another time he was
going down to Florida and going into the orange business;
another time he was going to buy a mill property near his
orchard, and put in a hydro-electric plant there and light up
that whole community; another time he was going to build
a Methodist Church and a parsonage and employ a preacher;
and build himself a palatial residence, and was going to show
people how to live; that these conversations were within a
few months of his death; that he did none of these things;
that he was not worth over $45,000; that he undertook to
stock his farm and bought up blooded Percheron horses; that

the last part of 1923 and the early part of 1924 he was in
Laurel Sanitarium for treatment for the drug habit; he was
a drug addict; that during the last years of his life he was
a drug addict and drank liquor also; he was generally pretty
strongly under the influence of morphia; that during the last
year or more he used it continually—daily; and the effect
of it was decidedly noticable in his appearance and in his
conversation and actions, and he grew weaker from the effect
of it both physically and mentally; that he knew as a phy-
sician that such use of morphia would affect the mind of a
person; that in the last month or so of his life his conversa-
tion was very rambling and disconnected; that besides Lau-
rel, he was also under treatment for the drug habit in Ta-
coma, and at Chappelle Sanitarium in Cumberland, the last,
in September, 1925, for about a week; that his condition
after he returned from Cumberland was weak both mentally
and physically.  This witness also said that the medical
term for testator's condition was paresis.  However, he had
never treated him nor prescribed for him, but had observed
him as a physician, and from what he saw of him that was
witness' opinion; that this disease was progressive; that he
saw testator on the day of the sale and he was in a weak con-
dition and his conversation showed that mentally he was in
a bad way; that witness retired from practice on account of
ill health, but to some extent kept in touch with the medical
profession during the eight years of his retirement.  He said
he thought his past experience in the practice of medicine
gave him such knowledge as would enable him to form an
opinion as to the capacity of testator to execute a valid deed
or contract on March 5th, 1926; but the record does not
show that he stated what his opinion was.

On cross-examination this witness admitted that he was
himself a morphia addict for twenty-five years prior to 1917,
and that year was treated for the habit at Chappelle Sani-
tarium and cured in three weeks; that he had not used mor-
phia since; that he had never resumed practice; he stated
that he thought he had been mentally competent for the past
nine years, as he had controlled all of his property and looked

after all of his own affairs during that time, and thought during all that time he had been capable of executing a valid deed or contract; that he came to the conclusion that testator had paresis in 1919, 1920, or 1921; he said, "Well, there was some mental aberration—there might be a question as to that, I never gave it special consideration, nor made any special diagnosis, but from his appearance and actions I concluded that the man was suffering from softening of the brain"; that he never examined him physically, never submitted him to the usual tests or to any of the ordinary tests; that he formed his opinion "just from his manner and conversation, and his walk, and what I knew of cases of that kind."

At this point defendants moved that this witness' testimony as to testator's suffering with paresis be stricken out. The court evidently didn't think the testimony was worthy of serious consideration, for the judge said: "Well, he has already told you that he didn't know definitely whether he was suffering from paresis or not, but thought perhaps he was." We entirely agree with the judge, that it was not an opinion of any importance. The witness testified that he had never had any special training in mental diseases. When asked whether he ever attended any cases of mental disorder, he answered: "I said I couldn't give you any information on that point."

Ignoring the indefinite and uninformed opinion of this witness, there is no testimony in the case of permanent insanity. See *Crockett v. Davis,* 81 Md. 154; *Gesell v. Baugher,* 100 Md., at pp. 682, 683 and 684; *Kelley v. Stanton,* 141 Md., at p. 394.

Dr. Samuel A. Watkins had known testator since 1898, but didn't see him so frequently till 1903, then saw him possibly twice a week until 1907, when he moved directly across the street, and from that time until the middle of November, 1925, when he again moved, saw him on an average once or twice a day. After that, until the day of the sale, he saw him once or twice a week; attended him professionally on one occasion about a year before his death,

when he took an overdose of paregoric; that he noticed in the latter years of testator's life he was very nervous and excitable. Sometimes he would be downhearted, sort of morose; at others very talkative—boiling over with big ideas of the things he was going to do—what he had in view; the witness told of the hydro-electric plant project and the chicken farm, which he said testator talked of frequently; said he knew testator was addicted to the use·of morphia to excess and gave his reasons for knowing it, aside from the appearance and actions of testator; also he talked like a man under the influence of morphia, had exaggerated ideas of things, talked irresponsibly and disconnectedly, in a more or less rambling manner; on one occasion, during the fall before his death, he brought a basket of apples from his orchard to show witness, but was unable to name the variety of a single apple; from 1918 to 1926 he was not as strong or active as he had been previous to that, and in the last few years of his life walked with a stoop and with a jerky gait; sometimes he would stagger in the street; that he gradually got worse all the time; that the last time witness saw him was on the day of the sale, on which occasion he was staggering, unsteady in his gait, more or less excited, complained of having pain across his chest, and said he would have to go and take a hypodermic. Witness only saw him a few minutes that day and was unable to testify as to any exhibition of mental deficiency on that occasion, and yet he was permitted to say that in his opinion he was then incapable of understanding the nature of the business in which he was engaged. This was prejudicial error, in the absence of testimony of permanent insanity. *Davis v. Calvert,* 5 G. & J., at p. 300; *Jones v. Collins,* 94 Md., at p. 410; *Kelly v. Kelly,* 103 Md., at p. 553; *Gesell v. Baugher, supra; Harris v. Hipsley,* 122 Md., at p. 430; *Mecutchen v. Gigous,* 150 Md., at p. 83; especially as witness had testified that at that time testator was under the influence of morphia. Witness further said his disease was "a morphia psychosis or alcoholic psychosis, morphia particularly. He defined the disease "as a deviation of the mind from the normal." In witness' opin-

ion the symptoms in testator's case were "his manner and conduct, his gait, his manner of walking, his big ideas"; that on March 5th, 1926, testator was not, in the opinion of witness, of sound and disposing mind and capable of making a valid deed or contract. It was prejudicial error over defendants' objection to permit witness to testify as to the capacity of testator at that date. The reasons he gave were clearly insufficient to support his opinion. See *Berry Will Case,* 96 Md., at pp. 60 and 61; *Crockett v. Davis,* 81 Md., at p. 150; *Gesell v. Baugher,* 100 Md., at pp. 683, 684; *Kelly v. Stanton, supra.* And it is perfectly clear that witness' opinion was based on these reasons.

At the conclusion of the cross-examination of this witness the court asked: "The mere fact that a man has a phychosis, * * * a morphia psychosis or any other psychosis, would not be any reason for you to believe that he could not make a will. There are different degrees of psychosis. There are men with psychosis who are able to make a valid deed or contract." A. "Oh, yes."

Dr. George S. Everhart has been a practicing physician in Hagerstown since 1909. His office was in the same block as that of testator. At first he saw him about once a month, but gradually "I got to going to see him a lot and he would come up to see me sometimes"; was called to see him once "six, seven or eight years ago." "He was in a fit or convulsion and I treated him for a day or so." After that witness saw him sometimes almost every day, passing up and down, and would frequently stop at his house after office hours at night. This witness relates the incident of a call by testator one night in the fall of 1925, when witness was busy in his consultation room with a patient, and others were in the waiting room. Testator rapped on the door and walked right in and said, "Oh, doctor, I want to see you right away." Testator had no collar on, his clothing was very much awry; he had one shoe on and one bedroom slipper; and he said, "For God's sake, give me a drink." Witness replied he didn't have any liquor to give him, and offered to give him some medicine. "Well," he says, "if

you don't have any liquor, please give me some morphia."
Witness told him he would give him a little medicine and
come down and see him later. "He was sort of excited and
very nervous." "Q. Just describe his condition? A. Well,
I say, very nervous, very much excited, very much up in
the air, and not the Dr. Scheller I used to know. Now that
had come along gradually up to that point. Q. Why did you
say he was not the same Dr. Scheller you had formerly
known? A. Well, in the first place, Dr. Scheller was very
much of a gentleman when I first knew him and always
when he was at himself he was not profane, but when he
was not himself he was noisy and untidy and—well that is
about all." Witness, after finishing with his patients, saw
testator at his house in bed. He seemed better, and said he
felt a whole lot better. "I looked around and on a dresser
* * * I noticed a bottle marked 'morphia,' a bottle of quarter
grain tablets and a hypodermic syringe. I says, 'Doctor,
did you use any of this medicine, and he says, 'Yes, I used
some of that medicine,' and he says, 'I will have to have
another one before night.' Well, then, it was probably some
time after nine o'clock."

The last time witness saw him was a few days before the
sale. He became an old man in the course of a few years.
Asked in what way testator became an old man, witness said
that it was gradual; that aside from that spell, when he had
that convulsion, witness personally knew nothing about any
other attacks except some few attacks of indigestion; that
he complained of his abdomen a great deal, and on several
occasions he had had colds that settled down in his chest, and
witness prescribed for him in that way, but aside from that
witness didn't attend him. Witness further related a con-
versation with him the night before Dr. Schindel married
testator's sister. Witness stopped in testator's office and he
said, "Hello, Boy," and witness responded, "Hello, Pop."
He said, "My best friend is going to marry my sister tomor-
row." "By the way," he said, "I am going to re-unite—
re-marry my wife (testator had been obliged to separate
from his second wife, a divorced woman, because of some

irregularity in the divorce she had procured), and we are going to take a trip of the world. Then I am coming back here and build a wonderful church and parsonage, and a home, and employ a minister and pay him $10,000 a year, and when I have this home of mine built, Mr. Matty Bloom's house will look like ten cents." The only time witness ever saw testator with morphia in his possession or near him was the time above spoken of. On another occasion testator was in witness' office, when a patient came in, who was a morphia addict, and asked witness for some morphia. Testator said: "For God's sake give the man some; every time you can help them along under these conditions when they need it, do it." He said, "I know from experience that it is almost necessary to have it when you are accustomed to using it."

There was a motion made by defendants to strike out this statement as to what testator said he knew from experience. The motion should have been granted. The purpose of this story was to show that testator was such a confirmed addict *at that time* that he couldn't do without it. No time was fixed as the date of the statement. Besides, it does not appear from the quoted statement that testator was referring to his own habit. This witness did not express any opinion as to testator's mental capacity.

Dr. Frederick A. Miller had been a physician since 1917, and had practiced in Hagerstown since 1924. Had known testator since witness was a boy, but had no direct contact with him till 1922, when he went to him for a birth certificate. He then spoke in a very rambling manner, with a flight of ideas; was very nervous. Witness was in a hurry and left as soon as he got the certificate. Next time he saw him was between Thanksgiving and Christmas of 1925. He then apparently remembered witness and came over to him. He said he was going to California; that people in town were persecuting him; they were trying to get his money. He kept on talking that way, until his ideas got in front of his words and he could not express them. At that time his hands would twitch and he would pay no attention to the person to

whom he was talking. He would jump from one subject to another without any apparent connection. Witness was with him ten or fifteen minutes. Next saw him after Washington's birthday in 1926, February 23rd or 24th, in Hamilton's cigar store. There was the same rambling conversation; he was highly nervous, would not pay any attention to the person to whom he was talking, sentences were not connected, varying almost on the edge of incoherence; his eyes were sparkling; noticed nothing else in his appearance. On that occasion was with him fifteen or twenty minutes; could not make out what he was trying to tell him.

Witness, having said he had heard all the testimony, was asked: "Assuming that testimony to be true and based upon that testimony and upon your own personal contact with Dr. Scheller, and with your medical knowledge, could you form an opinion as to whether or not Dr. Scheller was suffering from a disease? A. Yes. Q. What in your opinion was that disease? A. A psychosis.

The objection of defendants to this question should have been sustained, because: (1) The question does not relate to the time of making the will, or to any other specific time. (2) The assumption includes the correctness of the opinion of Dr. Watkins and of the opinion of Dr. Schindel, which the court held did not amount to more than a guess. *Williams v. State,* 64 Md. 396; *Berry Will Case,* 93 Md., at p. 569; *Kelly v. Kelly,* 103 Md. 554; *Harris v. Hipsley,* 122 Md., at p. 433. (3) The question mixes opinion based on the assumption of the truth of testimony and judgment founded on personal acquaintance. It was impossible for the jury to determine how far the opinion was based on hearsay, and how far on witness' medical knowledge applied to his personal contact with testator. "A hypothetical question must embrace every material element of the hypothesis founded upon the evidence, and it must not import into the question any element not founded upon the evidence in the case. If it offends in either respect it is defective and it is error to permit such a question to be answered." *Northern Cent. Ry. Co. v. Green,* 112 Md., at p. 505; *Gordon v. Opalecky,* 152

Md. 536; *Slacum v. Jolley,* 153 Md. 343.    The error was prejudicial.

Witness defined a psychosis as "a diseased mind, or any diseased mental state."    He said there were various psychoses; that he thought testator's was "an elation psychosis."

The witness was then asked in succession questions as to the effect of psychosis upon judgment; the ability to understand the nature of the business in which the sufferer from it was engaged; the ability to know and recollect his property; the ability to recollect the relative claims of the persons who were or should have been the object of his bounty. His answers to the questions respectively were: (1) Absolutely destroys judgment.    He would simply not be able to judge things as a normal man would.    (2) That one suffering from it would not be able to understand the nature of the business in which he was engaged.    (3) Or to know and recollect his property.    (4) Or to recollect the relative claims, etc.    Permitting these questions to be answered, over the objection of defendants, was prejudicial error.    They were abstract questions and not related to the time of making the will.    The uncontradicted testimony is that at that time testator had none of the symptoms of the disease as described by the witness.    And besides, the opinion that testator had an elation psychosis should have been excluded under our ruling on the previous exception, for the reasons there given.

The witness was then asked, after stating he had heard all the testimony: "Assuming all of the testimony which you have heard to be true, from your personal knowledge and contact with Dr. Scheller, and with your medical knowledge, would you say that Dr. Scheller, on the 5th day of March, 1926, was of sound, disposing mind, and capable of executing a valid deed or contract.    Over the objection of defendants, witness was permitted to answer, and said, "No, sir." This was error, for reasons set out in discussing the question asked Dr. Watkins as to his opinion of the capacity of testator at the date of the will, and for the second and third reasons given in discussing previous hypothetical question to the present witness.    The answer is improperly in the case.

The court then asked the witness why he thought he could answer the question just discussed, if he had not seen testator since February 23rd or 24th, and he answered: "Because a man could not get over a thing like that in the short time"; that with treatment it usually takes a minimum of three to four months; without treatment, he would not get well.

It appears from the cross-examination of this witness that in his opinion a man could not make a will unless he was entirely sane; that one suffering from "elation psychosis" *in any stage* could not make a valid deed, will, or contract. Certainly, at some stages, psychosis is nothing more than a delusion, an hallucination, or an individual idiosyncracy. Dr. Watkins testified that an automobile salesman who said he had the best car on earth had a psychosis. The present witness practically disqualified himself, by the standard he set, which is not the legal standard, from answering the hypothetical question; as his opinion, on that basis, was calculated to mislead the jury. Again he showed his inability to answer the question in the following cross-examination: "Q. Now then, they do have remission from the disease? A. Yes. Q. Then how do you know that he did not have a remission of the disease at the time he made the will? How do you know he was not competent to make a valid deed or contract during the two weeks after you saw him? A. If he has had a remission he would. Q. You qualify that by saying 'if he has had a remission'? A. Yes. Q. Then there would be no remission in elation psychosis at any stage without treatment? A. Perhaps.

Then the court took up the witness and by the following questions made him admit, practically, that he couldn't tell the difference between morphia psychosis and elation psychosis, and that testator might have had morphia psychosis. "Q. You don't know what the cause was in this instance? A. I haven't the slightest idea. Q. It was not morphia? A. I think it was accentuated by morphia. (Court): Both have the same symptoms, didn't you say? A. Well, they will have some symptoms practically the same. (Court): Don't they both have the same symptoms? A. Not necessarily;

practically, however, the same. What I mean by that, they both cause you to lose your idea of responsibility and your judgment, and make you a creature of impulse. (Court): Well, assuming that this man used morphia, wouldn't you say that this was a morphia psychosis? A. Well, perhaps it might be. I would hate to venture an opinion like that without knowing anything about it at all. I don't know how much morphia the man has taken."

There was this further cross-examination: "Q. Doctor, you do know, don't you, that a man can have this disease you call elation psychosis in its incipient form, and have frequent remissions into sanity until it progresses for some period of time? A. Well, sometimes, but sometimes things start right out with elation and that is the first the family knows anything about it. His family may not recognize the other signs of incipient psychosis at all. Q. Well, then, assuming you saw a man suffering from elation psychosis superinduced by morphia or any other cause, and two or three weeks' rest intervene, during which he takes no morphia or does nothing to superinduce, or that is calculated to cause the disease to progress, wouldn't that be apt to bring about a period of remission? A. Perhaps."

Dr. J. E. Fitznagle, a retired physician of Hagerstown, knew testator thirty years very intimately. During the last five or ten years saw him frequently. Last time was just before Christmas, 1925, in the post-office. Some time in October, 1923, testator impressed witness as not being the Dr. Scheller of the olden days. Witness retired from practice thirteen years ago. He related an incident about October, 1923, of testator's coming to witness' packing house and telling him he was going to put in a bigger plant than witness had, and knock him out of business. Witness saw him at times when he was not "the Dr. Scheller of old"; at such times he would talk to witness about his visionary schemes and his blooded horses. "Then again I saw him when he was the man I had known before." Asked whether in testator's later years witness ever saw him when he was like his old self, he answered: "Sometimes, yes, but after talking to

him for a while then he would drift off on to his big ideas.
Some of the big things he talked to witness about were a
large orchard, a large plant (he never talked to witness about
building a church); building homes out in his orchard. He
said he was tired of bowing and raising his hat (with an
oath) to these different kinds of people. He was not a pro-
fane man except when he had these big ideas in his head.
He was going to build for a tenant a house in his orchard
with twelve or fourteen rooms in it, with electric light, water
works, and bath room. Didn't say anything to witness about
a hotel. Witness went to his house one day to see him on
business, about October 1st, 1925, and saw a lady standing
in his front office, and he was standing in the door leading
back to the consultation room and he was talking about a
wife, and he told this lady he had no wife, and said: " 'Have
I, Fizie?' and I says, 'Doctor, you ought to know, I don't.'
And he was in his stocking feet at that time, no suspenders
on, his pants hanging away down like that, and nothing but
an undershirt on." He was nervous, seemed excitable, and
asked witness to excuse him, and he went out and got a glass
of milk. After that he quieted down. Witness didn't see
anything to make him nervous, only this lady asked for his
wife. He told witness he was going to have a sale and he
was going to California and buy his former preceptor's prac-
tice; that he was going to Florida for a while first. Asked
what was his condition, he replied that physically he was
deteriorating in the last five or six years. Witness, however,
repudiated the idea, suggested on cross-examination, that he
thought testator was insane. He said "I never said that
he wasn't mentally right. I said that he was excitable; that
he was not the Dr. Scheller of old."

Evidently the episode of the want of tidiness in his dress
in the presence of the lady, on one occasion, did not suggest
any mental trouble to the witness. He may have known
that testator was caught unawares and was trying to make
his escape.

Dr. Irving M. Wertz has been practicing medicine since
1903, all the time in Hagerstown except the first four years.

Knew testator well since 1908, when he moved nearly oppo-
site him. They were in and out of each other's office every
day many times; would see him at least every week from
witness' first acquaintance with testator up to the time of his
death; treated him on different occasions. Testator had been
complaining ever since witness knew him, and in the last ten
years especially. Within two years testator consulted wit-
ness as to his stomach and intestinal tract. Witness had
X-rays taken, and treated him for quite a while. In 1925,
the latter part of September, witness made a very careful
examination and advised testator to consult Dr. Barker in
Baltimore, and carried him there, and they talked with Dr.
Barker and his assistants. Witness and Dr. Barker went
over testator thoroughly, were at it three or four hours. Tes-
tator returned from Baltimore in a few days, and witness
treated him at his home for bronchitis and watched his case
carefully until the latter part of December, 1925; then wit-
ness was taken ill and had no more contact with him until
his death, and saw him only once in the meantime; that was
on the day of his sale, when witness from a window saw him
stagger into his house "a tottery and feeble man." During
the examination by Dr. Barker in Baltimore, testator's re-
plies to some questions as to the use of morphia were quite
evasive; he denied it until pinned down closely; he denied
being an addict, "and he then had some little flashings forth
of this elated, this glorious state of mind that so completely
characterized the earlier part of his illness in September and
October, when I had talked to him before going to Balti-
more." What the witness seems to have regarded as a
"flashing forth" of a glorious state of mind, was testator's
comparing himself with witness, a younger man, and speak-
ing of what he could do in comparison with witness. Testa-
tor evidently had a greater sense of humor than witness
seems to have. Witness further spoke of the unreliability of
the personal history which testator gave Dr. Barker. But
if he had been an addict that was to be expected. Some of
the tests made by Dr. Barker were naming the last five presi-
dents of the United States, and making some calculations.

Testator could only name two, and was very much off in making ordinary calculations. This reminds one very much of Judge McSherry's comment on such calculations in one of the *Berry Will* cases. It is to be noted that Dr. Barker was not present as a witness, nor was his absence explained. Witness related an occurrence in September or October, 1925, when testator came to witness' home about half past one o'clock in the early morning, and demanded that he come down stairs and go with him to get his wife. Witness rather thinks he (witness) said, "Come up and I'll give you a drink." It would be a waste of time to reproduce that story, as there is no escape from the conclusion that on that occasion testator was drunk either from liquor or morphia. It was on the ride home from that expedition that testator indulged in some flight of fancy in regard to building a mansion and buying a lot of farms; and also in an unrefined and vulgar conversation in regard to testator's surprise at his virility at the time of his second marriage.

Asked to give any other peculiar statements testator made to him after the concurrence above referred to, witness said: "Well, that is pretty hard to do, because a lot of the doctor's statements to me were absolutely incoherent, in fact almost always so. It was a mere jargon, a jumble of stuff. * * * I do recall very vividly of his telling me one minute how much devoted he was to his wife to whom he was irregularly married, and concerning whom this question arose. Then the very next minute how she would have to come back to him on her knees in order to conciliate him. How he had bought her trousseau, how he had furnished moneys for other things; how much he had lavished upon her. Then I recall one specific instance of his commanding me to call her home, or some other home which she visited in Hanover." Q. Did you do this? A. Yes.

Witness also remembered having called up Scott Wolfinger on testator's demand, and of his swearing at Wolfinger because there was something wrong in the divorce decree. "He would repeatedly refer to this conversation that we had on this night, when he told me of his wife, and he told me of

the great plans that he had of building a magnificant home and buying some farms—things like that. He had such a flight of ideas that I couldn't pretend to remember all of them."

Witness said he began to notice a deterioration in testator's condition close to the time of his son's death, which was in 1920. Asked what were the things he then noticed, he said there were expressions of suffering or mourning, or grief. "The doctor would say to me occasionally, 'There is nothing for me much to live for,' that he didn't see how he could sustain himself under this terrible loss—matters of that kind." The change in testator's mental condition "took place between the time of the death of his son and the time of his death, that this progressive change began and I fix it in my mind as the period in which Dr. Scheller's going down the hill, so to speak, began, and it was very close after his son's death. It was evidenced by the doctor's mentality varying somewhat. I noticed he was beginning to lose interest in the practice of medicine. The practice was never a very consuming passion in his life. Since 1908 he practiced some, but not nearly so busily as most men. I noticed, however, that even the small amount he was doing was even less. Then he got a flash that he wanted to become a specialist, a neurologist. He went over to New York or some other state, and spent a little time. Then he came back, and made practically no use of it. It was time lost. Then I noticed in the meantime he was becoming much more careless in his habits. * * * I noticed also in the meantime his speech. He was showing a degree of lewdness. His speech was more unchaste than it had been in former days when I first knew him. Then these beginnings just appeared more and more noticeable, which developed more and more into this full condition of mental aberration * * *. It was then that I commenced to see that he was reaching a point where he ought to be brought into the hands of some competent diagnostician and taken away, so that he would not be subjected to the abuses, whatever they may have been, to which he had been subjecting himself." The witness said testator was suffering

from "a psychosis," which he defined as "a condition of mind which shows a brain function that deviates from the normal." He said there were all degrees of psychosis, from a slight mental aberration to the last stage of insanity; that it was very hard to say how long testator had been suffering with it. Witness had noticed peculiar things about him, almost as far back as the time of the death of his son, but did not, until called specially to treat him, attempt to classify his illness, when he became responsible for an opinion and diagnosis, and he finally reached his "conclusion that Dr. Scheller was a psychosis patient, who had a mental disorder— he had a mind that was diseased." This was in the fall of 1925.

Witness further said that the disease was progressive, that is, it is "a disease which continuously grows worse unless the progress is arrested"; that testator's condition grew steadily worse. "Q. What was Dr. Scheller's mental condition the last time you saw him? A. It was for the worse." Witness said he had heard most of the testimony. "I think perhaps all of it." Q. Well then, assuming the testimony as to facts in the case to be true and from your experience as a physician and a friend of Dr. Scheller in his lifetime, will you tell the jury first whether or not in your opinion Dr. Scheller was capable of making a valid deed or contract on the 5th day of March, 1926? A. In my opinion he was not capable of making a valid deed, will, or contract on March 5th, 1926.

There was prejudicial error in overruling defendant's objection to the last question, because: (1) It is not at all certain from his answer to the inquiry that witness had heard *all* the testimony. (2) The facts on which witness based his opinion so far as they were disclosed were clearly insufficient to support it, in view of the absence of any evidence of permanent insanity. He was not in contact with testator for two and a half months. The most that any or all the facts and occurrences testified to by plaintiff's witnesses tended to show was delusions, and a weakened physical and mental condition which naturally progressed with the con-

tinued use of morphia. The witness himself on his cross-examination speaks of the alleged aberrations as delusions—Nowhere does he intimate that the abnormal condition had ever become a permanent one, in the sense that there might not be a remission. On the contrary, witness intimates it could be arrested. (2) The question confuses witness' opinion based on his personal knowledge of testator with his opinion based on the testimony of other witnesses. As to this vice, see the discussion and citation of authorities in connection with a like defect in the hypothetical question propounded to Dr. Miller.

But even if there were no error in allowing the question at the time it was asked, the subsequent cross-examination of the witness makes the opinion of the witness, as to the capacity of testator to execute a valid deed or contract, valueless, because it showed that witness did not understand what capacity was required. In his opinion a man suffering from insane delusions could not execute a valid deed or contract. And he said that was the basis on which he gave his opinion. He also said that a man must be entirely sane. It is true that, on being recalled at a later stage of the trial, witness said that he did not base his opinion upon the fact that testator was suffering from insane delusions, and that the only evidence he saw of such delusions at all in Dr. Scheller's life and in his contacts with him was the elation ideas that he manifested time after time. But in this he minimizes almost his entire previous testimony and that of other witnesses for plaintiff. For the burden of the testimony of them all was the enumeration of incidents intended to illustrate these so called elation ideas. Indeed, Dr. Miller characterized the disease which he said testator had as "elation psychosis." If these incidents were eliminated from the case there could not be even a pretense that there was at any time anything the matter with testator's mind. And at the end of the second edition of his testimony the witness again showed that he was relying on delusions, when he said that testator's plans of building so extensive a home on such a limited amount of money was one of the

facts in the case that helped him to draw his conclusion
as to the "mental inferiority" of testator at the time of
making the will.   To that extent, at least, his opinion was
influenced by his erroneous conception as to the effect of
an insane delusion upon the capacity to make a valid deed
or contract.   It is not even contended that the will was the
product of a delusion.

Dr. Charles H. Brace, a physician at Chappelle Sanita-
rium, Cumberland, Maryland, met testator on September
29th, 1925, when he was taken to the sanitarium for treat-
ment.   He examined him physically, only noticed that he
was very visionary; at that time he had a project in his
mind about building a big hotel.   "Of course, I did not know
whether that was due to the effects of some drug he had been
taking or not, but I know he was not normal."   Witness again
saw him the next day and his condition was the same.

The other witnesses were non-professional.   Mrs. Margaret
Schindel is the caveator.   She said she took care of testator's
property while he was at Laurel from December, 1923, to
April, 1924.   His condition for some time before he was
taken to Laurel was very bad; at times he would be very
stupid, and at the dinner table his hands would tremble so
that he could hardly hold a glass or knife or fork; he was
usually doped.   Witness went with him to Laurel.   Before
that he had been to Tacoma Park.   This witness fixes the
paregoric incident at a time before he went to Laurel in
1923.   Dr. Watkins said it was in 1925.   Witness was out
of town in the summer of 1924, and didn't see testator much.
She had a very satisfactory talk with him in the fall of 1924
and their relations were pleasant, and testator said, "We will
be as good friends as ever."   Witness spent the winter of
1924-1925 in Florida, returning in May, 1925.   In the
meantime testator was married.   About Easter, 1925.   When
she returned his physical condition was not good.   In Sep-
tember, 1925, when testator returned after having been
away, witness saw him.   His conversation was not natural.
He had wild ideas.   He could not go into the details of his

trip.  Witness spoke of his talk about building a Methodist church and parsonage and a fine home for himself, and about the hydro-electric plant, and the chickens.  Witness saw him after he came back from Baltimore in October, 1925.  She was in his house with him from that time until the middle of November.  His talk was rambling and he was always making big plans.  She used to call him "air castles."  He was talking about building houses and buying things; said he could not spend his income.  She observed him when he went to retire; he would sit down on the bed and sort of flop backwards.  He didn't have proper control of his body.  He walked like a feeble man; always walked with a cane.  He had no special treatment that witness knew of from January 1st, 1925, to the day of the sale.

On cross-examination, witness said she had some property.  She was not permitted to answer the question, "When you married Dr. Schindel, you married a man of considerable means, did you?"  This ruling was erroneous and prejudicial.  The offer was to prove that Dr. Schindel had considerable means and that testator knew it.  Witness apparently did not notice anything wrong about testator when she spent the evening and night of July 4th, 1925, at his home.  Met other people at testator's house a little while before that.  The only thing about his conduct on that occasion that witness took exception to was that, when his wife asked him where he had been when he came home, he told her he didn't want her ever to ask where he had been, and praised his first wife's cooking in her presence.  Witness frequently saw him under the influence of morphia prior to his marriage.  In rebuttal she denied that she got more than her share of the estates of her father and mother.

Louis L. Emmert, son of Mrs. Katherine Emmert, and a nephew of testator, was another witness.  There is nothing of special significance in his testimony.  He was with testator at a cattle show, at which he told some one he would be in the market for a large number of chickens to put on his farm, and told the nurseryman about his plans for putting in additional fruit trees, so as to make his orchard the largest

orchard in Washington County, that he wanted shrubbery to put around his house and wanted a landscape gardener to design it; then he went over to look at a sprayer and said he wanted one of these; and that he wanted to plant potatoes, and show the farmers of Washington County how to grow them; then he went down to where they were judging the stallions and he met a man named Herbert, whom he engaged to come out and take care of his blooded stock, which he was going to buy to stock his farm. Herbert had been an old acquaintance of the family—"perhaps they had attended school together." He asked Herbert about buying a stallion, but it was not for sale. He also spoke of putting a large number of sheep on the farm. He did not buy any horses at the fair, but later bought quite a lot of stock. There is absolutely nothing abnormal in anything above related.

Then the witness related an instance of a trip he took with testator to Baltimore just before he went to Laurel in 1923. He went to a clothing store and said he wanted the best overcoat in the place. The man showed him a two hundred dollar overcoat, which he put on, and said it suited him "fine," and he would take it. Witness told him he didn't think it was quite the thing for him, and he bought one for sixty dollars. This incident also reminds one of some of the trivial things that Judge McSherry commented on in the *Berry Will Case.*

John Smith was a foreman at a station right opposite testator's residence for twenty-eight years, during which time he knew testator, and saw him frequently daily when he was in town. He was much stronger when he came back from Laurel. This witness told about an incident which occurred in August, 1925, when he found testator at what he called "Halfway House" and brought him home. "He acted like a man that was drunk or doped," and did a lot of big talking. He said he had to have a quart of whisky.

This testimony so clearly showed that testator was drunk on that occasion that the court interrupted and asked what was the materiality of it. Counsel said, in effect, that it was important as showing that testator used whisky to a con-

siderable extent. While the testator was in this condition he told witness about most of the big things other witnesses mentioned. Witness also told of another occasion, about the same time or a little later, when he told witness he had bought, or was about to buy, the control of a bank, and become its president, and said if he did he was going to buy witness a $10,000 home. The last time witness saw him was on the day of the sale. He acted very nervous and weak; did not seem to take any interest in the sale. Saw him frequently between the first of January and the sale, but does not tell of anything peculiar in his conduct. Spoke of one occasion after testator returned from Baltimore in the fall of 1925, when testator came out in the street in an old striped coat with a big tear in it, which he used in firing the boiler. "His shirt was pulled out of his trousers just like he hadn't stuffed it down in his clothes, and sticking out all around here in the front and he went around the corner dressed that way." He had on an old slouch hat. "He wasn't walking very spry—very droopy and weakly like."

Amos H. Adams was clerk at a restaurant in Hagerstown known as Patterson Hotel. Had been there five years and had seen testator often. He would come in the restaurant sometimes twice a week; once in a while he would eat there, and would buy things there, such as cigars, cigarettes and milk. On two occasions he bought cigars, put them in his pocket, and went out of the store and came back again and asked for them. Didn't notice anything else peculiar that he did. Don't think he ever made a mistake in his change. He told witness on one occasion he was going to make a sale and was going to California. He was a little weak at that time, but talked all right.

John C. L. Summers is a real estate man in Hagerstown. Had a business transaction with testator in July, 1925. He promised to make a mortgage loan through witness and, when witness brought the mortgagor around to his house with the mortgage, testator said, "I didn't say I would take any mortgage," and he turned around and walked back in his office.

We have tried to analyze all the testimony. We have held

that none of the opinion evidence as to the condition of testator at the time he executed the will was admissible. And it is manifest from the discussion of some of the exceptions that, in our opinion, there was no testimony as to the facts which tended to show incapacity of the testator to make a valid deed or contract at the time of the execution of the will. It seems inconsistent with the special precautions provided, that trifling incidents in the lives of testators should, after they are no longer here to defend their wills, be treated as sufficient to set them aside. *Mecutchen v. Gigous,* 150 Md., at p. 86; *Kelly v. Stanton,* 141 Md., at pp. 396, 397; *Gesell v. Baugher,* 100 Md., at p. 684. There was no conduct or condition of the testator of an abnormal character testified to which could not well have been due to the temporary effect of alcohol or morphia, to both of which it appears he was addicted.

Some time after testator's return from Laurel Sanitarium, on a petition filed by the committee which had been appointed for testator, setting out that his health had improved to such an extent that the committee felt he should be discharged from its custody, and praying that the committee be discharged and that his property be restored to him, Judge Wagaman, on January 3rd, 1925, "being satisfied that the condition of C. R. Scheller warrants the discharge of the committee," passed an order rescinding the former order appointing the committee and directing testator's property to be restored to his own custody. It would seem that then, at least, testator was in condition to attend to his own affairs. And while there appears to have been a time in the fall of 1925 when it again became necessary for him to take treatment, there is no evidence that he was not competent when free from the influence of liquor and drugs. And there is no evidence that he was under the influence of either at the time he made his will, or that at that time he was so weak either in mind or body that he could not have made a valid deed or contract.

The want of testamentary capacity, when urged as a ground for the invalidity of a testamentary act in a given

case, must relate to the time of the act. Unless want of capacity, permanent in character, be established by proof as existing at a time prior to the act called in question, the presumption of capacity attends the act, and must be overcome by evidence that affords a rational basis for an inference of the want of it at the very time of the execution of such act. *Gesell v. Baugher, supra,* 682; *Kelly v. Kelly,* 103 Md. 553, 554, 555; *Birchett v. Smith,* 150 Md. 364; *Bell v. Wolfkill,* 152 Md. 407; *Mecutchen v. Gigous,* 150 Md., at p. 83. Making a will requires no greater capacity than making a gift. And it may be a very simple act. *Mecutchen v. Gigous, supra,* and cases there cited.

The third prayer of defendants should have been granted. This conclusion makes it unnecessary to consider other exceptions except as noted in the opinion.

*Rulings reversed, and case remanded.*

URNER and OFFUTT, JJ., dissent.