MERRITT B. SMITH, Executor, *v.* B. FRANK BIGGS
[No. 56, October Term, 1936.]

*Decided January 21st, 1937.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, and JOHNSON, JJ.

*James Weinroth* and *William J. Bratton,* for the appellant.

*Edward D. E. Rollins,* with whom was *Joshua Clayton* on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

The will of Annie H. Gonce was admitted to probate, and was later assailed by the caveat of her brother, who was not a beneficiary. The three issues, which were sent to the Circuit Court for trial, were the mental capacity of the testator at the time of the making of the paper writing, the knowledge of the decedent of its contents, and the existence of undue influence constraining and controlling the will of the decedent at the time of the signing of the instrument. The three issues were submitted to the jury, which found that the woman was of unsound mind and had no knowledge of the contents of the document, but that it had not been procured by undue influence.

The two prayers of the caveatee which asked the court to instruct the jury that there was no legally sufficient

evidence in the case from which the jury could find a verdict in favor of the caveator on the issues of mental incapacity and knowledge of the contents of the purporting will were refused, and these rulings are the errors assigned.

Since the undisputed testimony established that the paper was read to the decedent before she signed it, and there is no proof that she was the victim of any deceit, misrepresentation, suppression, or omission in its reading, she had complete knowledge of its contents, unless she was so incapacitated in mind as to be unable to comprehend what she heard. So, if she had mental capacity to execute the instrument she would, on the undisputed testimony, have known and understood its contents. The inquiry here is, therefore, reduced to the single problem: Whether she had mental capacity to make a valid deed or contract at the date of the execution of the paper writing. On the record there is not to be found legally sufficient evidence to submit this question for the verdict of the jury.

The woman was comparatively young, although she had the appearance of being much older. Her husband had died in June, 1934, and she was childless. She had not been in good health for some time, and her health grew worse after her husband's death. Shortly after this event, she sold all the household furniture, except enough to furnish three rooms. She had a complication of ailments, which compelled her to enter the local hospital on June 26th, 1935. The doctor in charge believed she had a tumor on the brain, and desired her to see a specialist. She did not see one and, without any improvement of her condition, she left the hospital on July 13th, and died on August 19th, 1935.

On June 11th, 1935, she made a will, which was executed in accordance with the statute, and was duly admitted to probate on the proof of the two attesting witnesses. Her estate is not large. She gave a dollar to her sister, Sophronia Terry, and another one to her brother, B. Frank Biggs, the caveator. After several small

gifts, she gave to her sister and brother, Mollie and James Biggs, the proceeds of sale of her personal property and the money in bank, after the payment of her debts and for her tombstone. Her house and lot was devised to Katherine Sullivan Austin, and whatever might be paid by the Cecilton Bank on her certificate of deposit was given equally to Rebecca Sullivan and Nellie T. Smith. She appointed as her sole executor Merritt B. Smith, who is the husband of the legatee of that name.

The executor had been for many years a personal friend of the decedent, and had looked after her business affairs for fifteen years. After her husband's death, he had attended practically to all of it. When the will was written the decedent was staying at the home of William Park, where Katherine Sullivan Austin, the devisee, was the housekeeper. Katherine Sullivan Austin, the daughter of the housekeeper, and Watson Austin, her husband, also lived there. The two women were the friends of the decedent. At her request, Mrs. Austin asked Smith to come to see the decedent. He and his wife, Nellie T. Smith, who was a friend of the testatrix, went that night, after their supper. He found the decedent in bed, and he and his wife went upstairs to her bedroom and they, together with Mrs. Austin, talked for some time, until the decedent said that she wished Smith to write her will. Then the others left, and the decedent stated how the will was to be drawn. At her dictation, he wrote as she directed. The will was then read to her, and she declared it was what she wanted, and said she wished Watson Austin and William Park to be the witnesses. The scrivener found that they had left the premises. When they returned, the two selected for witnesses were called to her room, and the will was executed. It was fifteen days after this that the decedent became so sick that she went to the hospital. She signed a check for her account at the hospital, and continued to transact her business affairs.

The testimony of the family physician, who had attended her for a number of years before her death,

and who had visited her the day before and the day after the execution of the will, was that she had the requisite mental capacity to execute a will at the time it was made. On cross-examination he stated that "She knew every penny she had and how she wanted it to go." It is quite true that, at times, she suffered much pain, but it was only during a period of three days before her death that she was unable to converse with the doctor.

In addition to this testimony is that of the attesting witnesses, who not only testified in that capacity, but also from personal knowledge that the decedent was competent. There was other testimony of similar tenor, and there were no facts nor circumstances which tended to show the disposition of her property was other than in accordance with her testamentary design. The cutting off of a brother and a sister with the gift of one dollar was done deliberately, and accurately reflected her attitude towards them. The division of her property among another brother and sister and three friends has no probative force on the issue of mental capacity, where there is no evidence from which it could be inferred that this disposition was indicative of an irrational mind.

While there is testimony on the part of the caveator which tended to show that the decedent was sick in body, and that frequently she wept, deploring the death of her husband and expressing her wish for his return, those were but the unreasoning lamentations of grief, and are not of themselves testimony to establish a lack of capacity to make a will. A lay witness on the part of the caveator testified that she, with a brother and a sister of the decedent, visited the sick woman from June 1st to June 12th, and that during this period the decedent did not know her and the decedent's sister, but at times, before they left, she would come to herself and recognize them; that, on the night of the 10th of June, the decedent was visited by her sister, Mrs. Terry, and her brother, Jimmy Biggs, and the witness, and she called the witness by a wrong name and the decedent's sister, Sophronia, by the name of Nellie, and that the decedent was unable

to carry on a conversation with any one at all. Again, on the night of June 12th, the same three had a similar experience, except that the sick woman did not speak. When asked to explain what was the basis for her conclusion that the decedent had no understanding nor comprehension of what was going on around her, she said it was because, when the witness went over to the bed and caught hold of the sick woman's hand and inquired if she knew her, and told her who she was, there was no reply, but she lay there and looked at her, and did not seem to recognize any one.

The two other lay witnesses, the brother and sister, testified substantially to the same effect. The slight difference in detail is not material. All three agree in testimony which establishes that the only basis for their separate opinions is that the woman did not talk to them; and that on the occasion of the visit on June 10th she called her sister and her companion by the wrong names. To miscall names, even if one be that of a sister baptized Sophronia, on June 10th, is certainly not evidence of incapacity, one day later, to make a will in which the woman not only recalled the sister's name but gave her a legacy of a nominal amount. Furthermore, a sick or any other person may choose not to talk. According to the family physician who visited her on the 10th and 12th of June, she not only talked rationally and possessed the requisite capacity, but she informed him that she did not want these relatives to come and see her, and that when they came she would turn over in bed and would not pay any attention to them but make out she was asleep.

The testimony of these witnesses and others to the conduct of the woman while in the hospital from June 26th to July 13th, 1935, is not of such a nature as would tend to establish mental incapacity of the woman at the time of the making of the will. The two nurses who cared for the decedent while she was in the hospital, and who were offered on the part of the caveator, gave testimony which tended to refute the theory of incapacity.

The chief surgeon in the hospital at Elkton, who saw her on her entrance into the hospital, stated that, in addition to her other disorders, he found that she had a tumor of the brain. After testifying to what her physical and mental conditions were while in the hospital, and stating that, in his opinion, the conditions had existed for several weeks before June 26th, the surgeon was asked if she were capable of executing a valid deed or contract on June 11th. There was no objection to this question, and the answer made was: "It would have to be my opinion that she wasn't, but I can't say definitely. I don't quite know. I can only go by the history in my judgment. I won't swear to anything before I am definitely sure. Q. You say then that, in your opinion, that she wasn't? A. I think my answer was that she wasn't." The answer is too vague and indefinite to carry the case to the jury on the issue of capacity. *Gesell v. Baugher,* 100 Md. 677, 682-684, 60 A. 481; *Berry v. Safe Deposit & Trust Co.* (*Berry Will Case*), 93 Md. 560, 49 A. 401: *Id.,* 96 Md. 45, 53 A. 720; *Davidove v. Duvall,* 160 Md. 345, 353, 153 A. 417.

There was no sufficient proof of permanent incapacity before the signing of the disputed will, and the full effect of what the testimony tended to prove has been given. It remains to consider the opinions expressed by the three lay witnesses, who testified for the caveator, that the woman was of unsound mind at the time of the execution of the questioned document. These opinions should not have been admitted, and the correctness of the rulings of the court at *nisi prius,* which held them admissible, are presented by bills of exceptions. The witnesses must not only have personal knowledge of the proximate acts and circumstances in reference to which they are permitted to testify on the issue of whether testamentary capacity existed at the time of the execution of the instrument, but these acts and circumstances must be sufficient to form a relevant and testimonial basis for the expression by a lay witness of an opinion on the subject of the capacity of the maker at the time of the execution of

the instrument in issue. The determination whether such a basis has been shown is a question for the court. *Berry v. Safe Deposit & Trust Co. (Berry Will Case)*, 93 Md. 560, 579-585, 49 A. 401; *Id.*, 96 Md. 45, 60, 53 A. 720; *Birchett v. Smith*, 150 Md. 369, 377, 378, 133 A. 117; *Wood v. Hankey*, 133 Md. 389, 393-397, 105 A. 430. The witness is not permitted a conjecture, and, so, may not express an opinion unless there appears from the testimony a sufficient basis for the formation of a rational conclusion.

In the consideration of the admissibility of an opinion, the court will not allow it to be given should the facts not afford an adequate ground causatively to support an inference as to the person's mental capacity. The party's ill health, sickness, pain, and physical weakness, accompanied by a refusal to speak or to talk, or, on a day before the signing of the paper, miscalling the name of a visitor and a sister, are facts of themselves too trivial, inconsequential, and normal to make an observer's expression of opinion of the party's incapacity at the time of the execution of the will more than an inadmissible conjecture. *Supra; Mecutchen v. Gigous*, 150 Md. 79, 83-88, 132 A. 425; *Cronin v. Kimble*, 156 Md. 489, 494-499, 144 A. 698. It follows that the expressions of opinion by the lay witnesses should not have been admitted. There was, therefore, error in these rulings. The opinions so admitted were without evidential value.

There being no other legally sufficient testimony upon which the jury could find a verdict for the caveator on the issues of mental incapacity and knowledge of the contents of the will, the first and second prayers on the part of the caveatee, which directed a finding of the jury for the caveatee on these issues, should have been granted. The rulings of the lower court on these prayers must be reversed. *Scheller v. Schindel*, 153 Md. 547, 551, 138 A. 415.

For the errors stated, the record will be remanded in order that the Circuit Court may direct a finding of the issues in conformity with this opinion and certify such

536

finding, with the costs, to the Orphans' Court, from which the issues were transmitted.

*Rulings reversed, and cause remanded.*