## CARRIE ACKER ET AL. *v.* MADELINE ACKER, COMMITTEE

[No. 11, April Term, 1937.]

478

*Decided May 25th, 1937.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Lee I. Hecht,* with whom was *Wilbert L. Merriken* on the brief, for the appellants.

*R. Contee Rose* and *John D. Alexander,* with whom were *Wm. Pepper Constable, T. Alan Goldsborough,* and *J. De Weese Carter,* on the brief, for the appellee.

JOHNSON, J., delivered the opinion of the Court.

On July 20th, 1934, Morris Acker, of Cecil County, Maryland, executed what purported to be his last will and testament. In that document, after making certain minor bequests to some of his relatives and a bequest of $100 to his nurse, he gave and devised the residue of his estate unto the Mercantile Trust Company of Baltimore and his attorney, Lawrence W. Hecht, jointly, in trust, to invest the same in proper and safe securities as they might deem advisable, and further directed that from the net income of the trust estate, on the first day of each calendar month, said trustees pay a sum not exceeding $75 for such necessities as his son, Joel Acker, his only heir at law, and who had previously been adjudicated a lunatic, might desire and select, with the approval of the trustees, during the term of his natural life. He further provided that, in the event of emergency or other unforeseen circumstances, the trustees were, in their discretion, to pay an additional sum of $25 to the son during each calendar month, and, if governmental

assistance of a financial nature were withdrawn from him, the trustees were authorized in their discretion to select a proper home or institution for him, in which case all expenses for 'his support and maintenance were to be paid by the trustees to the persons or institutions furnishing them. The trustees were further given power to sell, publicly or privately, and at such times as they might select, testator's home and its contents and all personal property which he owned that was not producing income, and the right of changing any investments made by testator without previous order of the orphans' court, in order to carry out the provisions of the trust thereby created. Upon the death of the son, the corpus, together with accruals, less the son's funeral expenses, was to be paid by the trustees to Hattie Acker, niece of the testator, free and clear of the trust, if she were then living, otherwise in similar manner to Sarah Acker, testator's sister-in-law. Testator also named the Mercantile Trust Company of Baltimore and Lawrence W. Hecht as executors of his will.

Testator departed this life at Port Deposit, Maryland, on June 15th, 1935, from a cerebral hemorrhage, but even before his death Madeline Acker, wife of Joel Acker and also his committee, had through her counsel filed in the Orphans' Court of Cecil County a petition and notice of her intention to caveat his will. It seems this notice had been misplaced, and on June 15th, which was the day of testator's death, counsel for the committee wrote the deputy register of wills, stating that, if the previous petition and notice had not been found, he inclosed another, also that "Morris Acker is not dead, but I understand he has had a stroke. If you hear of his death, please file this immediately. * * *" On June 17th, 1935, the will was filed with the register of wills for Cecil County, but, in view of the petition and notice of an intention to caveat, it was not probated. An answer was filed, and subsequently five issues were framed and transmitted by the court to the Circuit Court for Cecil County for trial. The first of these related to the *factum* of the

will, the second as to whether it was understood by, and its contents known to, the testator, the third related to testator's mental capacity at the time of executing the will, the fourth as to whether it was procured by undue influence, while the fifth was whether the will was procured by fraud exercised and practiced upon the testator. Madeline Acker, committee of Joel Acker, lunatic, was designated plaintiff, and the testator's remaining beneficiaries, also the Mercantile Trust Company and Lawrence W. Hecht, executors and trustees of the residuary estate, were defendants. The case was removed from Cecil County to Kent, and thence to Caroline County, where it was tried. At the close of the plaintiff's case the court directed verdicts for the defendants upon all issues except the third, which related to the mental capacity of the testator on July 20th, 1934, but refused their third instruction, which challenged the legal sufficiency of the plaintiff's evidence to show mental incapacity on the part of the testator on the date the will was executed. The trial then proceeded upon the issue of mental capacity, and at the close of the entire case defendants, by their prayer 3-A, again sought to withdraw the case from the consideration of the jury upon the ground that there had been offered no legally sufficient evidence to show that the purported will of July 20th, 1934, was not executed by the testator when of sound and disposing mind and capable of executing a valid deed or contract. This instruction was refused, and the jury answered the third issue "no," thereby determining that at the time testator executed the will he did not possess sufficient mental capacity to execute a valid deed or contract, and upon this question we are called upon to review fifty-two exceptions taken by appellants (defendants below) to the rulings of the trial court, the second to fiftieth, inclusive, of which relate to rulings upon evidence, the first to the trial court's overruling an objection made by appellants to a remark of appellee's counsel in his opening statement, while the fifty-first concerns the prayers. The trial in the lower court consumed five

days and, in view of the numerous exceptions, the record is rather bulky. The court will therefore, as far as practical, state its conclusions resulting from a careful consideration of the entire record. *Longanecker v. Sowers,* 148 Md. 584, 129 A. 896; *Donnelly v. Donnelly,* 156 Md. 81, 83, 143 A. 648.

Morris Acker was a foreigner by birth and came to this country when a young man. At the time of his death he was approximately sixty-eight years of age, and for about forty years prior to June 1st, 1928, had successfully conducted a department store at Port Deposit. He accumulated a modest fortune, most of which he invested in stocks and bonds, and, notwithstanding the depression, his estate at the time of his death amounted to more than $25,000. Prior to June, 1928, due to a disturbance of his thyroid gland, Acker became mentally and physically an ill man, and accordingly sold his mercantile business to his son, Joel, for $5,000. He entered the Laurel Sanitarium for treatment and a short time thereafter returned to Port Deposit, later entering a hospital where he underwent an operation which completely relieved him. He thereupon became normal, but in October of that year, while with his wife at Atlantic City, he suffered a stroke of paralysis and was later brought to his home at Port Deposit. Acker had always spoken with a peculiar accent, which after the paralytic stroke was more pronounced, and there is some evidence tending to show that as a result of the stroke one side of his face was somewhat twisted. Before entering the Laurel Sanitarium, and after returning therefrom until his death, such medical attention as he required was rendered by his personal physician, Dr. Clarence I. Benson, who stated that the thyroid difficulty which caused them to commit him to the sanitarium was found to be due to secretions that were being absorbed by his system, producing a toxic effect and a "dazed" condition, but that the subsequent paralysis in no way affected his capacity to transact business and his mentality was that of a normal person until his final attack, which preceded

his death a very short time, and this view was held by all who during 1934 transacted business with him. Upon his return to Port Deposit, after the paralytic stroke in the fall of 1928, he was feeble physically and had no use of his right arm and right leg. At that time his wife was living, and the son, Joel, had previously married Madeline Acker, but they had no children. A nurse was procured in the fall of 1928 and lived in testator's home until his death, but, at the time of his wife's death in February, 1930, testator by methodical habits of living had become very much improved physically. At first he was required to use two crutches in getting around, but later discarded one of these and still later was able to walk by using a cane. Naturally the loss of his wife, to whom he was greatly devoted, caused him much grief, but even before her death, and continuing up to a few days before his decease, it is not disputed that he successfully managed his property and estate. Even in the home he decided what was to be bought and paid his bills promptly, sometimes in cash and at other times by check. On one occasion he had some paperhanging done in the home and throughout the period he looked after his investments, bought and sold stocks and bonds, and this business required him to visit his three Baltimore brokers on an average of once a week. For these trips, as well as any other rides he desired to take, he hired automobiles, and while upon such occasions his nurse usually accompanied him, she knew nothing of the immediate business he was transacting. When he arrived in the city, he dismissed her and told her when and where to meet him. Moreover, he gave instructions to his driver as to where to take him. He also in similar manner dealt with a brokerage firm in Wilmington, Delaware, and while throughout this period his use of the right arm and leg was very much restricted by reason of the paralysis, it in no way affected his mentality, and he always knew when the coupons upon his various bonds were due and was careful to clip them. He carried an account at the Cecil National Bank, of which until its

reorganization he had been a director, and his dealings with that institution were always satisfactory. For a few years before his decease, he, with certain others, were makers of a note held by a finance company, and at each maturity date he renewed it promptly, and often called it to the attention of some of the comakers, the last renewal being only a few days prior to his death. In March, 1930, testator made a will, in which he bequeathed somewhat larger amounts to certain of his relatives and also bequeathed to them certain jewelry, and left his residuary estate in trust. Therein the maximum provision made for his son was $250 during any one calendar month, plus the burial expenses of the son, and at the son's death the remainder was bequeathed to certain of testator's relatives. However, shortly before July 20th, 1934, testator declared he had sustained losses on various investments and he felt he should make a new will, but, before doing so, he desired to ascertain the exact condition of his son, who, it may be stated, had become insane at the time of his mother's death in February, 1930, and was first taken to the Phipps Clinic in Baltimore, later to Sheppard and Enoch Pratt Hospital, thence to the hospital at Perry Point, and was later removed to a hospital at Northport, Long Island, the two last mentioned being government institutions. Accordingly, testator hired a car and a driver, Mr. Hasson, to take him to Northport. His nurse accompanied them. The driver was unfamiliar with the route, and testator directed him through New York City, and thence to Northport, where, upon arrival, he found the doctor in charge of his son and inquired as to the son's condition, declaring "this is the object of my visit." He stated that he was going to change his will when informed by the doctor that the son would never recover. They returned to Port Deposit, and shortly thereafter he had his attorney, Mr. Hecht, call to his home, where he gave detailed instructions for the preparation of the will here attacked, and a few days later, when it had been prepared, he considered it carefully and signed it in the presence

of three witnesses selected by him, declaring it to be his last will and testament.

It would, therefore, appear, from what has been said concerning the situation of the testator on July 20th, 1934, that the disposition which he made of his estate is not necessarily unnatural, but entirely consistent with a purpose that his estate should first be subjected to caring for his lunatic son adequately for the remainder of his life, the balance, if any, to go to one of testator's relatives.

In his opening statement to the jury, counsel for appellee said that in 1928 the testator became "violently insane," whereupon appellants' counsel objected and was overruled. To this action the first exception was taken. Appellants urge that this remark so prejudiced the jury as to constitute reversible error, but with this contention we do not agree. Counsel making the statement was an officer of the court, who had a right to assume that he knew what he could prove and would be in position to show that the insanity referred to as existing in 1928 was of a permanent character. Indeed, unless he proved its permanency, testimony relating thereto would have been inadmissible, and it is difficult to perceive how, under the circumstances, the court could have ruled otherwise, and equally hard to understand how a juror of average intelligence would have been prejudiced or misled by the remark. For that matter such a statement, unless supported by proof satisfactory to the jury, might well have injured appellee.

Exceptions 2 to 8, inclusive, were taken to the court's action in permitting certain questions to be asked Dr. Irving J. Spear, a psychiatrist and specialist on nervous and mental diseases. The only time Dr. Spear saw testator was early in June, 1928, after his commitment to Laurel Sanitarium, before his thyroid trouble was corrected. As a result of an examination then made by him, he was permitted to state that on that occasion the patient was demented, crying and wringing his hands, that his blood pressure at that time was 185 over 105,

and he had hardening of the arteries, and was suffering from arterio-sclerosis, had a heart murmur, and this condition was progressive. Notwithstanding this, he stated that he endeavored to suggest some treatment which would arrest his disease. He was also permitted to give his prognosis made in June, 1928, which was in effect that the patient would never improve mentally. As said by this court in *Gesell v. Baugher*, 100 Md. 677, at page 687, 60 A. 481, 484, "The presumption of the law being in favor of sanity and testamentary capacity, the evidence to support a caveat on the issue of insanity must ordinarily tend to show either that the testator was of unsound mind at the time of the execution of the will, or that he was affected with permanent insanity prior to its execution, in which latter case the burden of proof of capacity is shifted to the caveatee. *Taylor v. Creswell*, 45 Md. 430; *Higgins v. Carlton*, 28 Md. 115; *Tyson v. Tyson*, 37 Md. 582; *Davis v. Calvert*, 5 G. & J. 300." See also *Willis v. Willis*, 171 Md. 144, 188 A. 217, and cases there cited; *Jarman on Wills* (5th Ed.), p. 50.

There is nothing in Dr. Spear's testimony to justify the conclusion that testator's heart murmur, blood pressure, or arteriosclerosis in 1928 were unusual for one of his age, nor that his mental condition at that time was attributable to those factors. Admittedly his mentality was then impaired, but subsequent events demonstrated that this was not permanent in character. Therefore, his prognosis was, under the circumstances, without evidential value, and this is also true as to his opinion concerning testator's mental capacity at the same period. Furthermore, his opinion that Acker's condition, as then found, was progressive, must yield to actual facts which show that subsequently testator's mentality was restored.

George McCool, a lay witness, produced by plaintiff, was a salesman for the Standard Oil Company. He first met testator in 1932 and saw him again in 1933. On both occasions he attempted to induce testator to sign a contract for fuel oil, but his efforts were unsuccessful. He stated that "he was talking about the oil and he would

not stay on any one thing for a very long time", that about the time he seemed to get interested he would begin speaking of his house and was nervous and upset, although witness admitted he would "have been delighted to have him accept the contract." Clearly this evidence in no way tended to support a finding that during those years testator was in any manner mentally incapacitated. *Smith v. Biggs,* 171 Md. 528, 189 A. 256, and cases there cited.

Another lay witness, Trowbridge, testified that he saw testator very little from 1928 up until 1935, and their chief topic of conversation pertained to their sons, whose ages were approximately the same. It will be recalled that at that time Acker's son was a lunatic, yet the witness laid much emphasis upon the fact that testator, when the sons were mentioned, would often walk away or drop the conversation. Upon this slight observation, which it may be observed in no way tended to test testator's mental capacity, this witness was permitted to express an opinion as to whether testator was capable of making a valid deed or contract on the date he executed the will. To this ruling, the ninth exception was taken. Even if it could be conceded that the witness possessed sufficient opportunities for obtaining knowledge of the testator as to entitle him to express an opinion as to his mental capacity, he described no acts or circumstances which were sufficient to form a rational basis for an opinion. *Smith v. Biggs, supra.*

A third lay witness, Vannort, who had known testator for some years, in 1928 noticed a difference in his appearance in that he had no use of one hand and his legs were "wobbly." This, of course, was very close to the time he sustained the paralytic stroke. In October, 1934, the witness accompanied Mr. Rollins, a candidate for state's attorney for Cecil County, upon an electioneering trip, and Mr. Acker went with them. Vannort stated that, as they were riding along the road, Mr. Acker often waved his good hand to various people who were working in the fields, and once he waved to a man whose back was

turned; that he asked Acker if he knew the people, and he replied that he did and they used to deal with him in his store, but testator admitted he could not recall their names. Witness then concluded, "he don't know who those people were, and from that, of course, I formed my opinion that Mr. Acker was * * * really mentally deranged." The tenth and eleventh exceptions were reserved to the court's action in permitting this witness to express an opinion as to Acker's capacity on the date of the execution of the will.

The testimony of the witness, Squire, related only to an occasion prior to testator's commitment to Laurel Sanitarium in 1928, when he visited witness's home. He described him as "wild, eyes popped, with appearance of a man suffering under violent excitement." Testator's condition at that period was undoubtedly as described, but, since it proved to be only temporary in character, evidence concerning it was valueless as an aid to ascertaining his mental condition six years later.

The witness Abrams, who had known Mr. Acker for some years, but did not know he was paralyzed at Atlantic City, spoke to him often in 1934, and at times saw him walking on the road for exercise, observed his crippled condition, and that his face was drawn and his eyes had a "glassy" appearance, never had any conversation with him upon those occasions, but did in 1934 talk with him several times a month at the stores in Port Deposit. When Acker was engaged in business, he never spoke to witness concerning financial matters, but on these occasions he made reference to having bought and sold certain bonds and stocks, and, as these were large blocks, it surprised witness, who therefore thought he was talking "out of his head." There is no effort to show that the testator was not in position to buy the securities he said he had bought, and the evidence is clear that during that period he was dealing in them. The witness was then asked as to testator's coherence in July, 1934, and replied, "what do you mean by coherence. I can't answer that." Later the thirteenth exception was re-

served to permitting him to be asked concerning Acker's mental capacity on July 20th, 1934. The facts given by the witness and used by him as a basis for his opinion strongly suggested testator's mental capacity upon the date in question, but in no manner tended to show his mental incapacity.

Dr. William J. Jack, a practicing physician, testified that he worked in the Cecil National Bank, of which he was president. While he had known testator forty years, he had not been his family physician in recent years, except that on the day of his death, during Dr. Benson's absence, he was called in. He admitted that from a medical standpoint he had no familiarity with Acker, and his most vivid recollection of the man was an observation he made just before he was committed to the sanitarium in 1928, when he saw him trying to throw away his money. In 1933 and 1934 Dr. Jack came in contact with him often, because of his visits to his bank, and sometimes spoke to him along the road. So far as the record shows, he never made a physical examination of nim at any time, yet he testified that testator was emotionally unstable; that he would start to talk on some particular subject and without completing it, as witness thought, he would begin discussing something else entirely different. His memory was bad and sometimes he would return a second time to discuss all over again some subject in which he was interested. He talked about investments, and in a few days he would come in and his view in regard to certain investments would be changed, and the continuity of his conversation was broken; that he had the appearance of a man suffering from senile dementia. It is significant that the doctor in no way questioned Acker's ability in 1933 and throughout 1934 to transact business, because he transacted business with him, and there is nothing in his testimony to suggest any irrational conduct on the testator's part in reference to those transactions. He not only carried an active banking account in witness's bank, but witness admitted that throughout 1934 he was accepting Acker's

note, and that he considered it a good note. Exceptions 14 to 16½, inclusive, were made to objections to questions the answers to which elicited this testimony, the one last mentioned being taken to the court's action in refusing to strike out all the testimony given by the doctor. Dr. Jack had never examined testator in his life to determine his mental capacity, and his contacts with him were for the most part through business transactions which he admits testator conducted entirely satisfactorily. He was glad to have his banking business, considered his note good, and furthermore admits he had previously stated testator was capable of making a will. Under these circumstances, an expression of a contrary opinion has for its foundation no rational basis. *Berry Will Case,* 93 Md. 560, 578, 49 A. 401; *Scheller v. Schindel,* 153 Md. 547, 138 A. 415; *Daugherty v. Robinson,* 143 Md. 259, 122 A. 124.

Exceptions 17 to 22 relate to rulings made with respect to the testimony of another lay witness, Madeline C. Acker, committee of Joel Acker. She was permitted to contrast his appearance prior to the stroke with that after 1928. Witness saw testator twice in June, 1934, and he made no effort to converse with her, and refused to answer her questions, but as this court observed in *Smith v. Biggs, supra,* a person may choose not to talk. Witness also visited testator in September of the same year and states he was unable to complete sentences which he began. This was some weeks subsequent to the execution of the will, and, when asked to describe his conduct between 1932 and 1933, she admitted she did not know what was meant by the word "conduct." She further stated that, when testator was crossing the road and saw cars coming down it, he would stand in the road and permit the cars to pass around him, and this frightened her, but it must be borne in mind that he was then a cripple and proceeded across the road with great difficulty. Under such circumstances, when he observed an approaching car, it was an act of prudence on his part to stop and let it pass by. She was permitted to state

the amount of funds in her hands as committee, also that her husband had no income on July 20th, 1934, nor since then from any source, yet it is apparent that he was being cared for by the government, and his failure to receive any income since his father's death is explained by this attack upon the will. Although having attempted to converse with testator but three times in 1934, twice in June, once in Sepember, the witness was permitted to express an opinion as to his mental capacity on July 20th of that year. The court sustained an objection to a question asked her as to whether, when she was in Port Deposit on a visit in 1934, she did not attempt to make the Acker home her living quarters, notwithstanding the witness had previously testified that her relations with Morris Acker had always been friendly. The witness was not qualified to express an opinion as to the mental condition of testator at the time he made his will, and the allowance of her answers to the other questions could throw no light upon testator's mental condition at the time the will was executed. *Quimby v. Greenhawk*, 166 Md. 335, 171 A. 59, and *Smith v. Biggs, supra.*

Exceptions 24 to 29, inclusive, were taken to the court's action in overruling objections to certain questions asked Dr. Spear, who was recalled, and refusing to strike out answers given by him to such questions. He was first asked whether from the examination he made of testator in the spring of 1928 he could state from what disease he was then suffering and its probable duration. His answer was that it was cerebral and general arteriosclerosis. He was then asked whether he had heard all the testimony in the case, and permitted to answer. He was next asked, assuming all facts in the testimony to be true, and excluding all opinions of lay and expert witnesses and inferences based upon them, if he was able to express an opinion as to whether Acker was capable on July 20th, 1934, of executing a valid deed or contract, and, after being permitted to answer that question, was allowed to state that opinion. He answered

that he was incapable on that date. There were no facts properly in the case which even an expert could have used as a foundation for expressing an opinion as to testator's mental capacity on the date he executed the will. And the same comment applies to the opinion given in response to similar questions asked Dr. E. Paul Knotts contained in exceptions 30 to 33, inclusive.

Exceptions 35 to 41, inclusive, were reserved by appellants to the rulings of the court in connection with the testimony of their own witnesses, and, while these exceptions were not abandoned, our views of the case are such that we feel it would not be helpful to prolong this opinion by discussing them.

Dr. Knotts, called by appellee in rebuttal, testified he had read Dr. Benson's testimony. The doctor had been practicing medicine for sixteen years and was a member of the State Board of Medical Examiners, also president of the County Medical Association. He possessed no qualifications on mental and nervous diseases, except such as he acquired in completing his course of study, but stated he observed mental cases in his practice, and that psychiatry and neurology were included in the subjects which the State Board of Medical Examiners gave on examinations. He was then asked to assume that a man fifty-three or fifty-four years of age received a paralytic stroke in 1928, causing hemorrhage of the brain, resulting from arteriosclerosis, the stroke affecting the right side of his body and causing permanent impairment of the use of his right arm and leg, which continued until the date of his death, and that his death was caused by apoplexy of the brain, to state whether or not that man's mentality would be permanently affected by reason of the 1928 stroke, and his answer was that in his opinion the mentality would have been impaired by the stroke which he suffered in 1928. He does not attempt to state that such impairment as in his opinion resulted rendered the testator incompetent to execute a valid deed or contract on July 20th, 1934, but, apart from this, in view of the undisputed evidence that throughout this

period testator was a competent, capable, and reasonably active business man, any theory entertained by him as to impairment must of necessity yield to fact.

Exceptions 43 to 49, inclusive, were taken to the rulings of the trial court in connection with the testimony of a rebuttal witness, Miss Ebelein. The witness was secretary to one of appellee's counsel, and in the course of her duties used shorthand. In July, 1935, she accompanied Mr. Alexander on a visit to see Mrs. Quinlan, who had nursed testator. It was after dark, between 8:30 and 9:00 p. m., and witness, her employer, and Mrs. Quinlan sat on the front porch. Witness stated that she took down answers made by the nurse to certain questions propounded by her employer, but she did not write down the questions. She was permitted to read those answers from her notes and one of them was that Mr. Acker depended on the nurse for everything, even to finishing out his speech, that his stroke left him in a bad way. Witness also stated that she was able to see how to make those notes from the rays of a living room light upon the porch. She further stated that Mrs. Quinlan had made this statement, "I do not think Mr. Acker's condition was such that he could stand any worry. He had to have routine and no excitement and nothing unusual"; also that Mrs. Quinlan had stated that Acker owed her $500, but Mr. Hecht had said she had nothing to show for it. She further quoted Mrs. Quinlan as having stated that Mr. Acker had not done right. The foundation for this line of questions was laid during Mrs. Quinlan's testimony, and she denied having made those statements, but did admit that she had filed a claim against the estate, because her employer first cut her wages from twenty-five to twenty dollars per week and later reduced them to fifteen dollars, telling her he had sustained losses and holding out to her the hope that if certain things worked out in the future she would be remembered. We perceive no error in these rulings, as the testimony seems to have been admissible for the purpose of affecting Mrs. Quinlan's credibility as a wit-

ness. However, it could not, of course, be used to supply a defect in the proof offered by the plaintiff, upon whom rested the burden of showing the incapacity of the testator to make a valid deed or contract at the time he executed his will.

The fiftieth exception was taken to the trial court's refusal to exclude the testimony of Dr. Irving J. Spear.

This brings us to the fifty-first exception, which relates to the prayers. Since we are of the opinion that the plaintiff offered no legally sufficient evidence to show that the paper writing, executed by testator on July 20th, 1934, purporting to be his last will and testament, was not executed by him when he was of sound and disposing mind and capable of executing a valid deed or contract, appellants' prayer No. 3-A, which sought a binding instruction to that effect, should have been granted. For that reason it is not necessary to refer to the other prayers or to pass specifically upon the propriety of the various rulings upon the admissibility of evidence. If all of it could be regarded as admissible, its probative effect, when considered as part of the plaintiff's proof as a whole and in the light of undisputed facts, was inadequate to support the theory that the testator was mentally incompetent when he executed his will.

*Rulings reversed.*