GEORGE A. FINCH *v.* CHARLES F. LEE ET AL.

[No. 38, October Term, 1944.]

*Decided December 20, 1944.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, MELVIN, BAILEY, CAPPER, and HENDERSON, JJ.

*L. Harold Sothoron,* with whom was *Charles Carroll, Jr.,* and *P. Michael Cook* on the brief, for the appellant.

*R. Tilghman Brice, III,* and *William H. Forsythe, Jr.,* with whom was *Wilbur R. Dulin* on the brief, for the appellees.

GRASON, J., delivered the opinion of the Court.

On June 25, 1943, Dr. James Brown Scott died, at the age of seventy-seven years. He left personal property appraised at $74,722.54 and real estate appraised at $19,000. A will dated the 4th day of June, 1942, purporting to be the will of Dr. Scott, in which W. W. Stevens, Jr., was named executor, and a codicil thereto, dated the 29th day of January, 1943, were offered for probate in the Orphans' Court for Anne Arundel County. Another will, dated the 21st day of November, 1939, purported to be a will of Dr. Scott, in which George A. Finch is named executor, was produced for probate. Mr. Finch, the executor named in the first will, filed a caveat to the last will and codicil. Issues usual in such cases

were framed by the Orphans' Court and sent to the Circuit Court for Anne Arundel County for trial. The case was removed to and tried in the Circuit Court for Howard County. Upon the trial of these issues by that court, at the conclusion of the caveator's testimony, the jury was instructed to answer the issues sustaining the will and codicil. From exceptions reserved to the rulings of the court, the caveator brings this appeal.

The evidence offered has been carefully read. We will not attempt to review it in detail, but will state the facts it proved and the inferences legally to be drawn therefrom. There were over forty exceptions reserved to rulings on evidence and several reserved to rulings on prayers. We will not deal with these numerous exceptions individually, but will give, in general, the reasons that actuate our decision.

Dr. Scott was a lawyer, highly educated, learned, and outstanding in the field of his endeavor. In his work he associated with, and knew intimately, gentlement of note. Some of his intimate friends, with whom he worked for years, were called to testify in this case. The evidence shows that until 1938 he was possessed of a strong, penetrating and brilliant mind, and was healthy in body. In the winter of 1938 he suffered a stroke, returned to his office shortly thereafter, showing no signs of its ill effect other than that he was much weakened, and had to lie down and rest every afternoon. From this stroke he never recovered, and the evidence shows that thereafter he continued to decline in mind and body. From 1916 to 1940 the testator served as secretary to and as a member of the board of trustees of the Carnegie Endowment for International Peace. In 1940 it was apparent to his co-trustees that Dr. Scott was showing signs of physical deterioration, slowing down mentally, and becoming unable to continue to carry the burden of his offices. Dr. Butler says he suffered a coronary thrombosis in 1938, from which it seemed to him, in 1940, the testator had not completely recovered. The evidence describes business meetings and social functions in connection with these meetings, and other occa-

sions at which Dr. Scott was present. In former days he took an active part in the discussions of matters considered at such meetings, but after 1940 he took no interest at all in the discussions of business matters. His memory, which in days of health was strong, failed him. On such occasions he could not recall the names of his associates with whom he had worked throughout the years. At times he did not appear to remember them at all. When attempting to speak, he mumbled and could not be understood. In health, the testator was a dignified man, courteous and gracious in manner, and a charming conversationalist. In the days of his deterioration, at these social functions, he not only failed to recognize and speak to old friends, but made a public display of himself. At dinner, upon one occasion, he put his napkin on his head, then took it off and tucked it in his collar. Upon entering a room where his associates were meeting, he kissed the hand of one of them. At a dinner at which he was the honored guest, he abruptly left the table and tried to take an elevator. He was intercepted and brought back, but again fled from the table, got in an elevator and left.

On November 20, 1942, he left the Benjamin Franklin Hotel in Philadelphia, where he was stopping, was found on a street by the police and taken to a hospital. He did not know his name, where he lived, where he came from, and he was finally identified by papers found in his wallet. The doctor stated: "He was in a befuddled state of mind, seemed to be suffering partial amnesia, and was not responsible for his action."

Kenneth D. McCracken and his wife went to see the testator on August 13, 1942, at his home in West Annapolis. McCracken was a nephew of the testator's wife, and he had provided for him rather generously in his first will. Contrary to his custom, he called neither McCracken nor his wife by their first names. During this visit he looked "rather puzzled and said 'Wasn't there another boy?'" Alan McCracken was a brother of Kenneth, whom the testator, in his first will, also generously

remembered. During this visit he told how he fought the Germans in the first World War, when, as a matter of fact, he did not see combat 'service during that war. It was evident to a layman he was then suffering from delusions.

In January, 1939, the testator employed W. W. Stevens, Jr. There is not a word in the record that he knew Stevens before. After his employment he seems to have accompanied the Doctor everywhere he went. He and his wife lived with the testator at his home at Wardour, West Annapolis, and the wife acted as housekeeper. She stated to Kenneth McCracken, on the visit referred to, that the testator "was not permitted to have visitors very often because it excited him and that she discouraged any visitors."

On June 3, 1941, testator and Stevens drove to Washington where they met Mrs. Doris Stevens. She was not related to W. W. Stevens, Jr. This lady went with testator to his home at Wardour. It was his seventy-fifth birthday. As they neared the home Stevens got out of the automobile to water some stock. During Stevens' absence from the automobile the testator told her he didn't have anything around there. In fact, they (evidently referring to Stevens and his wife) were trying to get all of his property and he did not want them to have it. Notes and loans were being called for. He said: "I guess everything is all right, Mr. Finch has that will, * * * Mr. Finch has some will in Washington." There was evidence tending to show that testator was afraid of Stevens.

Neither the first will, nor the will and codicil in question, will be quoted. Under the will in question Dr. Scott left his property to Trustees, of whom Stevens was one, for the purpose of building a hospital, and if there was not sufficient money for the purpose, then to be used for the purposes set out in the will. The intent manifested by the will is that a hospital should be built, but if there was not money sufficient for the purpose, then it was to be used for purposes connected with a

hospital. Stevens is named as superintendent for life of the contemplated hospital, and is made executor under the will.

Under the codicil Stevens is left $2,500 and an automobile and trailer, and his wife is bequeathed $7,500. There is not a word in this record to show that the testator, in his lifetime, was interested in hospitals.

By the first will he provides for his loved ones and friends; remembers and provides for the carrying on of the work which he engaged in and loved; remembers his deceased mother and sister. This will, when read in the light of the testimony in this case, bespeaks the life that he lived and evidences his feelings and his desires.

The will in question is saturated with suspicion and the codicil thereto is likewise contaminated.

We think this testimony, together with these testamentary documents, afforded a rational basis for the expression of an opinion by an alienist as to whether or not Dr. Scott was, at the respective dates of the execution of the will and codicil in question, of sound and disposing mind and capable of executing a valid deed or contract. The withdrawal of the issue of capacity from the jury was erroneous.

We will not set out the law governing the question of the mental capacity required of one to make a valid will; neither will we review the law governing undue influence as applied to wills. This law has been stated many times by this Court. In considering the correctness of the rulings on evidence, we reaffirm what has so often been said by this Court regarding what has been denominated as knowledge. An opinion expressed by one who knew a testator for years and had intimate relations with him in business and social affairs, is in the nature of knowledge, and received in evidence as such. *Townshend v. Townshend,* 7 Gill 10, 24. In the late case of *Doyle v. Rody,* 180 Md. 471, 481, 25 A. 2d 457, 462, Judge Delaplaine, speaking of such testimony, said:

"In form, it is an opinion because it expresses a conclusion or inference based upon observation, and the witness could not very well communicate a correct idea

without embodying his impressions or judgment to a certain extent. But in substance, the mental condition of a person is a fact, and the opinion of a witness who has had opportunities to observe his appearance and conduct is in reality a statement of the fact."

Such a witness knows the testator, and it is his knowledge of him, the opinion gives to the jury, which it is entitled to consider. This principle runs through our decisions from the Townshend case to *Doyle v. Rody.* In some of the rulings presented in this case this principle was violated. Other rulings, excluding hearsay evidence and requiring the mental standard the law demands of one making a will to exist at the time of its execution, were correct.

It can be shown that a testator, prior to the date of the execution of his will, was incapable, and a lay witness can express an opinion if a sufficient foundation has been laid from which it appears that such opinion is tantamount to knowledge or a fact. So, too, it may be similarly shown that after the execution of a will a testator was incapable. But, in either instance, if such testimony stands alone and there is no evidence tending to show that such incapacity before the date of the will continued to the date of its execution, it is legally insufficient to establish incompetency at the date of the execution of the will.

In the case of *Mecutchen v. Gigous,* 150 Md. 79, 132 A. 425, the lower court was reversed because it withdrew the issue of undue influence from the jury. At page 89 of that decision in 150 Md., at page 430 of 132 A., Chief Judge Bond pointed out several elements in that case that are presented by the evidence in the case at bar. And we think there was error in this case in taking that issue from the jury.

> *Rulings affirmed in part and reversed in part, as specified in this opinion, and a new trial ordered, with costs to appellant.*