ARLIE L. PLUMMER *v.* OSBORN RAY LIVESAY
ET AL.

[No. 46, October Term, 1945.]

*Decided December 18, 1945; rehearing denied January 18, 1946.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*W. S. James* and *Glasgow Archer*, with whom were *Archer & Day* on the brief, for the appellant.

*J. Wilmer Cronin*, with whom was *James H. Broumel* on the brief, for the appellees.

MARBURY, C. J., delivered the opinion of the Court.

Appellees, the only son and granddaughter (daughter of a deceased daughter of the testator) filed a caveat after probate of the will of Robert L. Livesay in the Orphan's Court for Harford County. Eight issues were ordered sent to the Circuit Court for Harford County to be tried by jury. At the close of the caveators' case, the seventh and eighth issues were withdrawn by agreement, and the court directed verdicts in favor of the caveatee on all issues except the fourth. The case then proceeded on this issue, which was whether the purported will dated April 22, 1943, was executed by the testator when he was of sound and disposing mind, and capable of executing a valid deed or contract. At the end of the whole case, the caveatee filed a demurrer prayer to the fourth issue, but the court refused this prayer. The jury brought in a verdict for the caveators, answering "no" to the fourth issue. Thereafter the caveatee filed a motion *n. o. v.* which was overruled by the court. Thereupon an appeal was taken to this Court.

In addition to the question raised by the demurrer prayer to the forth issue, and by the motion *n. o. v.*, appellants also have a number of exceptions to the rulings of the trial court on evidence. Three of these, which relate to the opinions given by lay witnesses as to the mental incapacity of the testator, have a direct bearing on the question whether the jury should have been instructed to find a verdict for the caveatee on the fourth issue.

The testator was a man of about seventy-five years of age who had moved to Harford County from North Carolina about 1920 and had purchased a 200-acre farm which he operated until he sold it in February, 1943. He died on August 5, 1943, leaving a widow, who had been married to him about fifty years, four living children, a son and three daughters, the latter all married. He also had another daughter, who had died, leaving two children, one of them being one of the caveators. Until the spring of 1942, the testator had been in good health, but about that time he was taken ill. The nature of his illness is variously described as high blood pressure, stroke, hearth disease, and kidney disease. From that time on, his physical health was constantly deteriorating until he eventually died. In February, 1943, he sold the farm, and the following month moved to the farm of his grandson who was the son of the appellant, the executor of his will. The son had married and had a family of his own and was living in New Jersey. The other caveator had been brought up by the testator and his wife after the death of her mother, but had subsequently married. She lived on the farm until it was sold, but after that she did not live with her grandparents, but saw them quite frequently. By the will, one daughter who was the wife of the executor and the mother of the grandson at whose farm the testator was living, was given a bequest of $1,000. The only son was given $100, the two grandchildren, who were the children of the deceased daughter, were given $100 each, and all the rest and residue of the estate was given to the three married daughters equally. The will contains a provision that the wife is given nothing because she has released all her interest in the estate for a consideration of $5,000 which was paid her on the date of the execution of the will. The testimony shows that the agreement to do this was signed at the same time as the will and that the $5,000 was paid to the wife.

If the evidence produced by the caveators was insufficient to permit the case to be considered by the jury,

then, of course, all rulings other than those relating to this question, need not be passed upon. We, therefore pass to the determination of this question, and those rulings on evidence directly related to it. These are those admitting the opinion of lay witnesses as to incapacity.

The admissibility of opinions of lay witnesses as to the mental incapacity of a testator has been considered many times by this Court. The rule is that such opinions, if founded upon facts which would justify reasonable men in holding them, are admissible as being, themselves, facts. In order to render them admissible, therefore, there must be first shown to the Court both the pertinent facts upon which the opinions are based, and the opportunity the witnesses had of observing the testator. It is not sufficient for a lay witness to show that he, or she, knew the testator for a period of time long enough to observe his conduct. This testimony alone does not justify the admission of the opinion of the witness as to his mental capacity. Such a so-called naked opinion can only be given by the witnesses to the will. All other lay witnesses must show sufficient facts to justify, in some measure, their views. If the underlying facts are not sufficient, then the Court will not permit the opinion to be given.

In the long line of cases establishing this rule, perhaps the best statement of it is to be found in the case of *Johnston v. Schmidt,* 158 Md. 555, 149 A. 283. In that case the Court, speaking through Judge Digges, said, 58 Md. on page 568, 149 A. on page 288: "When the issue is one of sanity or insanity, or the question of whether the testator was competent or incompetent, over a long period, to execute a will, a lay witness who has had the opportunity and has become acquainted with the characteristics, habits, actions, conduct, and demeanor, gained through various business transactions over that period, has knowledge, and his statement of the result of such an association is more than an opinion. His observation of and contact with the testator has resulted

in fixing an impression in his mind as to the testator's mental capacity as certainly as the handwriting of one may become knowledge to another, or the identity of a person may be testified to as a fact. The many and varied incidents covering a period of years, which result in this knowledge, could not be expected to be given in detail by the witness, and therefore his impression, which this court has said amounts to knowledge, and is not mere opinion, is permitted to be given to the jury on such an issue. Even if in exceptional cases such a witness was able to give all the facts which resulted in the impression equivalent to knowledge, it would be improper to require it because of the time such practice would necessarily involve. In such a case it is only necessary that the witness give what might be termed samples of the facts upon which he bases his conclusion, so that the court and jury may understand that it does not rest upon frivolous and inconsequential occurrences, but has a rational foundation. On the other hand, when the question is not one of sanity or insanity, but is one of incapacity shown to be due to the temporary dethronement of the mental faculties by the administration of opiates, the obscuration resulting from the near approach of death, or the like, witnesses can, without difficulty and without consuming much time, state in detail the facts as they existed, which, when stated, place the jury in equally as advantageous position to determine the capacity of the testator as the witness could possibly be, and therefore the opinion of the witness amounts to no more than saying that if he were on the jury he would find that the testator had capacity or lacked capacity, as the case might be." In the earlier case of *Kerby v. Kerby*, 57 Md. 345, the Court said: "The rule is now well established, that a sufficient foundation must be laid for an opinion, and that non-experts cannot be permitted to give it, without giving the facts and circumstances on which the opinion is based. *Waters v. Waters*, 35 Md. 531. This is to enable the jury or tribunal on whom devolves the duty of decision to judge of the value of the opinion

expressed; for if the opportunity of forming a judgment has not been good, the opinion will be of little or no value." The same idea is expressed by Judge Delaplaine in the late case of *Doyle v. Rody,* 180 Md. 471, where, at page 481, 25 A. 2d 457, at page 462, he said: "But a non-expert witness is qualified to express an opinion as to a testator's mental capacity only where the acts and circumstances, of which the witness had personal knowledge, are sufficient to form a basis for the formation of rational opinion. He must state the facts as far as he can and disclose what led to his conclusion. If the whole testimony of the witness fails to show facts sufficient to justify the conclusion reached by him, he should not be permitted to express an opinion." The same idea was expressed by Judge Grason in the case of *Finch v. Lee,* 184 Md. 98, 103, 40 A. 2d 371, 374, where he said: "An opinion expressed by one who knew a testator for years and had intimate relations with him in business and social affairs, is in the nature of knowledge, and received in evidence as such. * * * It can be shown that a testator, prior to the date of the execution of his will, was incapable, and a lay witness can express an opinion if a sufficient foundation has been laid from which it appears that such opinion is tantamount to knowledge or a fact. So, too, it may be similarly shown that after the execution of a will a testator was incapable. But, in either instance, if such testimony stands alone and there is no evidence tending to show that such incapacity before the date of the will continued to the date of its execution, it is legally insufficient to establish incompetency at the date of the execution of the will." Among the other Maryland cases which have so held in an unbroken line are *Townshend v. Townshend,* 7 Gill 10 at page 27; *Dorsey v. Warfield,* 7 Md. 65 at page 73; *Weems v. Weems,* 19 Md. 334 at page 345; *Waters v. Waters,* 35 Md. 531 at page 542; *Williams v. Lee,* 47 Md. 321 at page 326; *The Berry Will Case,* 93 Md. 560 at pages 579 and 580, 49 A. 401; *Struth v. Decker,* 100 Md. 368 at pages 378, 379, 59 A. 727; *Grill v. O'Dell,* 113 Md. 625 at page

635, 77 A. 984; *Harris v. Hipsley,* 122 Md. 418 at page 432, 89 A. 852; *Smith v. Shuppner,* 125 Md. 409 at page 417, 93 A. 514; *Daugherty v. Robinson,* 143 Md. 259 at page 266, 122 A. 124; *Cronin v. Kimble,* 156 Md. 489, page 496, 144 A. 698; *Smith v. Biggs,* 171 Md. 528 at page 535, 189 A. 256; *Acker v. Acker,* 172 Md. 477 at page 487, 192 A. 327.

The contention of the appellants is that no sufficient facts are stated by the three lay witnesses who testified to the testator's incapacity to justify the admission in evidence of their opinions. It becomes necessary, therefore, for us to examine the evidence of these witnsses with this contention in view.

Mrs. Myrtle Livesay, widow of the testator, testified that the latter was seventy-five years old at the time of his death and that he had been sick about a year. He had high blood pressure and a slight stroke at the beginning, and he never got better and gradually became worse. She said: "His mind failed considerably and he could only talk rationally for a few minutes. He could not go any distance rationally. He would get mixed up and he was that way all during his sickness. * * * Sometimes he could not understand what I was saying to him. * * * He could not understand what he read and what he was reading. * * * Part of the time he could go on for a short time and then he would not know what we were talking about. He would start to tell you something and he would get all mixed up in a little while. He could not go on for any length of time or any distance or anything like that until he was all mixed up. He could not write a letter. He would start a letter, but he would get all mixed up and could not finish it." She was then asked what was his mental condition on the day the will was signed and she said: "He could be rational when you talked to him; he could answer you rationally for a few short sentences and then he would get mixed up, and then he would be sane and rational for a few minutes again. Then again he would be up and anything he said would be right and he would

want to write, but in a few minutes he would get mixed up and could not go on with it." On the strength of these statements Mrs. Livesay, who had lived with Mr. Livesay all his married life, approximately fifty years, and who was the mother of his five children, was permitted to state, that in her opinion, on April 22, 1943, the testator was not capable of making a valid will, deed or contract. Subsequently, on cross-examination, she was asked again whether her husband had sufficient mental capacity to know what he was about, and to know and understand the circumstances of what he was doing on the day he made the will, and she said, "Not to truly know the whole formula, he could not have done it. He could for a short period of a few minutes, know what he wanted done at times." She was asked if this specifically referred to April 22, 1943, and she said: "I did not pay much attention to his mind that day. I did not pay much attention to it, if that was the day. I remember the day, but nothing happened that I remember about this." On the strength of the last statement the appellees moved to strike out the testimony of the witness giving her opinion of the capacity of the testator on April 22, 1943. That motion was overruled and is the subject of the fourteenth exception taken.

These statements by the widow, in spite of her long life with testator, do not, in our opinion, form any basis for a rational opinion as to his capacity to make a will. They are not only too general, but in themselves they indicate that at times the testator was entirely rational. The witness herself admits that she is unable to say what was his condition on the day the will was executed. We do not think she should have been allowed to express her opinion as to the mental condition of the testator.

Another lay witness was Edith Bay, granddaughter of the testator, who had lived with him until 1939, when she was married, and was living with him again in 1942 when he was taken sick. She saw him frequently in the spring of 1943 although at that time she was not living with him. She stated that when she was talking

to him in the spring of 1943, at times he would start on one subject, especially about fishing, and soon he would go off on another subject that did not have anything to do with fishing, and then he would come back to the subject of fishing. He never seemed to stay long on one subject. She also said that when he was on the bed he would throw the covers off, and it made no difference if there were ladies in the room or not; that prior to his illness he was a modest man. That after he was taken ill in 1942, he would not read papers and magazines. On these facts this witness was allowed to testify as to the mental capacity of the testator on April 22, 1943. We do not think she produced sufficient facts to justify the admission of such testimony.

The third lay witness allowed to give an opinion was Charles L. Greer, who married the sister of Mrs. Livesay. He had known the testator for fifty years and in the last two or three years of his life had seen him probably once a week. They formerly lived on adjoining farms. He said that the testator's physical and mental condition were not good in 1942 and 1943, after he was taken ill, and his mental condition went down with his physical condition. He said he and the testator were close friends and when he would go to see him, "Bob would start to tell me something and in a short time he would be off on something else. * * * After he was taken ill he talked very little at any time, but when he would it was not connected up." He also testified to a game of cards he played with the testator prior to February, 1943. He said that Mr. Livesay was a good card player before he was taken ill, but on this particular night he was not, and that he got mixed up as to who won the game. On these meager facts, he was permitted to state his opinion. This was clearly erroneous.

Other than that from these three witnesses, the only testimony bearing on the mental capacity of the testator was that given by Osborn Ray Livesay, the son. He testified that he was forty-seven years old and the oldest of the children, that he worked for his father on a farm

and operated a saw mill and feed mill business in North Carolina and Maryland until he bought eighty acres from his father and began farming for himself. That he was not paid for his work by his father, while working in North Carolina, that he mortgaged the property he got to make improvements, and in 1929, he deeded the eighty acres back to his parents. He produced a letter from his father dated March 12, 1929, in which the latter said that the Land Bank had sent a man over to see if the father would take over the mortgage, otherwise the Bank would have to foreclose. The father said he would pay the October payments, amounting to $309, and stop the sale and take over the loan of $5,100 and a debt at the Bank of $1,200. That if the son could then sell the farm inside of twelve months for more than the father put out, the son could have every dollar above the amount provided by the father. The father also stated in his letter that he did not believe the property would sell for more than the debts at the time, but that it was worth more money. The son further testified that he came down to see his father in the spring of 1942, after he was sick, and that at that time the father more or less did not know what he was doing, that he would start to talk about something, but he would never finish it, but go into something else. He had never been that way before. Along in November of the same year he came down again and his father's mental condition was worse. They tried to have a game of cards and his father didn't know what to bid or whether he had made his bid. The next time he saw him was April 25, 1943, and his mental condition was just about the same as it was the last time. He thought the son was coming down to take him fishing and he wanted to go fishing. The witness said his father then talked in the same way he had on the last trip. He would start all right for a couple of minutes, then he would not talk just right and he would not look just right out of his eyes. He had a different look in his eyes than he ever had before. The son further testified that the father would be on the bed and, no matter who came

in, he would get up with his underclothes on, which was contrary to his practice prior to 1942. Before that time the witness said he regarded his father as a modest man. The Court refused to permit this witness to give his opinion as to the testator's mental capacity. The facts testified to by him give no basis for a rational conclusion that the testator was mentally incapacitated at the time of the making of the will.

There is only one other circumstance in the case, besides the facts related by these lay witnesses, which is offered to show mental incapacity. The testator, by the second paragraph of his will, said: "As my son, Osborn Ray Livesay, received during my life time what I consider his full share of my estate, I give and bequeath the sum of $100 to him absolutely." The testimony of the mother and of the son is that the son had never received anything from the testator during his lifetime. It is contended that this small bequest to the son was based upon a statement which was not true, and therefore indicates mental incapacity.

In the case of *Hiss v. Weik*, 78 Md. 439, 28 A. 400, 402, the testator, Bishop Ames, gave his invalid daughter an annuity of $600, his insane son and that son's dependent daughter nothing, and gave his married daughter his entire estate after an annuity of $2,000 to his widow. This Court, speaking through Judge McSherry, said: "While the gross inequality of this will—the palpable injustice of its provisions, which absolutely cut off an insane son, upon whom a motherless and helpless child was dependent, and gave to an invalid daughter a mere annual pittance out of a large and valuable estate— *would not alone be sufficient to annul the will,* yet such a disposition by an aged and feeble testator furnishes intrinsic evidence involving the will in suspicion, and was competent to be considered by the jury, in connection with other circumstances, in passing upon the issue of *undue influence.*" (Italics supplied.) The Court further said, that the reason given in the will for disinheriting his son was stated as follows: "I make no provision

for my son, Edward R. Ames, Jr., for the reason I have already given to him all I desire to bestow upon him," and that if the reason given was in fact not true, the only alternative left was that no motive originating in his own mind influenced the testator at all, and the act which was ostensibly his and was ostensibly justified by him by the assignment of a false explanation would not be his voluntary act. In the case of *Johnson v. Johnson*, 105 Md. 81, 65 A. 918, 121 Am. St. Rep. 570, the testator made no provision in his will for his two infant children by his second wife, and the evidence showed that he had an insane delusion as to the illegitimacy of these two children. The Court said that as the evidence in the case tended to show an insane delusion, the case should be left to the jury. In the late undue influence case of *Drury v. King*, 182 Md. 64, 32 A. 2d 371, 375, in which the opinion was written by Chief Judge Sloan, it is stated: "In Bishop Ames Case, *Hiss v. Weik*, 78 Md. 439, 28 A. 400, it was declared that the provision of a will may be so grossly unjust as to require little direct evidence to conclude that it was the product of undue influence, and cites *Grove v. Spiker*, 72 Md. 300, 20 A. 144. A comparison of the facts in those cases will show that they can hardly be held up as precedents in this. * * * The testator had a right to disinherit his children, if he chose, but he could not deprive his wife of her lawful share of his estate."

The Bishop Ames case and the Johnson case, above referred to, can be easily distinguished from the one before us. In the Bishop Ames case the testator had made a statement prior to the making of the will indicating that he intended to care for the child of his insane son, and it was entirely foreign to his proved nature to do what he did. And the question at issue was undue influence and not mental incapacity. In the Johnson case it was shown that the basis of disinheriting the children was the delusion which the testator had about them. In the case before us we have nothing but the fact that the testator declared that his son has received

what the testator considered the full share of his estate. That might have been something or nothing. There is no evidence of any delusion or of undue influence. The farm transaction, in which the father relieved the son of his debts, may have caused the father to consider that any moral obligation to give the son any share in his estate, had been cancelled. It was entirely within the rights of the testator to leave his property to his daughters rather than to his son, or grandchildren. The fact that he did so is not sufficient, in the absence of other facts, to justify the submission of the issue of mental incapacity to the jury.

We hold, therefore, that the "A" prayer of the caveatee (appellant) should have been granted, and the jury instructed to answer the fourth issue "Yes." We will, therefore, remand the case in order that the Circuit Court for Harford County may direct such a finding on the fourth issue, and may certify such finding with the costs to the Orphans' Court of Harford County. *Smith v. Biggs*, 171 Md. 528, 189 A. 256; *Schmeizl v. Schmeizl*, 184 Md. 584, 42 A. 2d 106.

*Rulings reversed and cause remanded.*